[No. H034778. Sixth Dist. Mar. 8, 2012.]

ANDREW GARCIA, a Minor, etc., et al., Plaintiffs and Appellants, v. CONMED CORPORATION, Defendant and Respondent.

Counsel

Law Offices of Carcione, Cattermole, Dolinski, Okimoto, Stucky, Ukshini, Markowitz & Carcione, Joseph W. Carcione, Jr., Gary W. Dolinski and Joshua S. Markowitz for Plaintiffs and Appellants.

Horvitz & Levy, Stephen E. Norris, Dean A. Bochner; Wilson, Elser, Moskowitz, Edelman & Dicker and Genese K. Dopson for Defendant and Respondent.

Opinion

**PREMO, J.**—Plaintiff Andrew Garcia, a minor, by his guardian ad litem, Paul Garcia, sued Dr. Douglas Phan for medical malpractice and defendant ConMed Corporation for products liability after suffering injuries during a tonsillectomy in which Dr. Phan used an electrocautery device powered by a generator manufactured by defendant. After defendant's argument to the jury, plaintiff moved for a mistrial grounded on misconduct of counsel during argument. The trial court found that defendant's counsel, Genese Dopson, had engaged in misconduct, denied plaintiff's motion, and admonished the jury to ignore Dopson's improper statements. The jury returned a verdict in favor of plaintiff against Dr. Phan for approximately $750,000. It also returned a verdict in favor of defendant against plaintiff. As to defendant, plaintiff moved for a new trial grounded on misconduct of counsel during argument. The trial court found that the misconduct was not prejudicial and denied the motion. On appeal from the judgment, plaintiff contends that defense counsel's misconduct requires reversal of the judgment. We hold that the misconduct, though egregious, was not prejudicial in the circumstances of this case. We therefore affirm the judgment.

## SCOPE OF REVIEW

■ "When presentation of the evidence is concluded in a civil trial, 'unless the case is submitted to the jury on either side or on both sides without argument, the plaintiff must commence and may conclude the argument.' [Citation.] ■ In conducting closing argument, attorneys for both sides have wide latitude to discuss the case. ' " ' "The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such

matters are ultimately for the consideration of the jury." ' " [Citations.] "Counsel may vigorously argue his case and is not limited to 'Chesterfieldian politeness.' " [Citations.] "An attorney is permitted to argue all reasonable inferences from the evidence, . . ." [Citation.] "Only the most persuasive reasons justify handcuffing attorneys in the exercise of their advocacy within the bounds of propriety." [Citation.]' [Citation.] The same rules apply in a criminal case. [Citation.] [¶] An attorney who exceeds this wide latitude commits misconduct. For example, '[w]hile a counsel in summing up may indulge in all fair arguments in favor of his client's case, he may not assume facts not in evidence or invite the jury to speculate as to unsupported inferences.' [Citation.] Nor may counsel properly make personally insulting or derogatory remarks directed at opposing counsel or impugn counsel's motives or character. [Citation.] Additional examples abound; these are but a few." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795–796 [16 Cal.Rptr.3d 374, 94 P.3d 513] (*Cassim*).)[1]

■ Attorney misconduct is an irregularity in the proceedings and a ground for a new trial. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870 [135 Cal.Rptr. 647, 558 P.2d 545] (*Decker*).) Although it is common practice to urge that attorney misconduct is an error of law justifying the grant of a motion for a new trial, a party is not required to move for a new trial before raising attorney misconduct as an issue on appeal. (See *Estate of Barber* (1957) 49 Cal.2d 112, 119 [315 P.2d 317] [generally, motion for a new trial not necessary to preserve an issue for appeal].) However, to preserve for appeal an instance of misconduct of counsel in the presence of the jury, an objection must have been lodged at trial and the party must also have moved for a mistrial or sought a curative admonition unless the misconduct was so persistent that an admonition would have been inadequate to cure the resulting prejudice. (*Cassim, supra*, 33 Cal.4th at pp. 794–795.) This is so because "[o]ne of the primary purposes of admonition at the beginning of an improper course of argument is to avoid repetition of the remarks and thus obviate the necessity of a new trial." (*Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 320 [74 Cal.Rptr. 534, 449 P.2d 750] (*Sabella*).)

---

[1] The California Supreme Court first used the term "Chesterfieldian politeness" in the context of the permissible scope of closing argument in *People v. Bandhauer* (1967) 66 Cal.2d 524, 529 [58 Cal.Rptr. 332, 426 P.2d 900], quoting the Ninth Circuit's decision in *Ballard v. U.S.* (9th Cir. 1945) 152 F.2d 941, 943, revd. on other grounds (1946) 329 U.S. 187 [91 L.Ed. 181, 67 S.Ct. 261].) The term itself is a reference to Philip Stanhope, the fourth Earl of Chesterfield, who wrote and published letters to his son and instructional books on manners and deportment, including Principles of Politeness, and of Knowing the World (1794), and who reportedly said, "Next to good breeding is genteel manners and carriage" and, "An able man shows his spirit by gentle words and resolute actions." (See Colonial Williamsburg: That the Future May Learn from the Past <http://www.history.org/history/teaching/enewsletter/june03/primsource.cfm> [as of Mar. 8, 2012].)

■ But it is not enough for a party to show attorney misconduct. In order to justify a new trial, the party must demonstrate that the misconduct was prejudicial. (*Cassim, supra,* 33 Cal.4th at p. 800.) As to this issue, a reviewing court makes "an independent determination as to whether the error was prejudicial." (*Decker, supra,* 18 Cal.3d at p. 872.) It "must determine whether it is reasonably probable [that the appellant] would have achieved a more favorable result in the absence of 'that portion of [attorney conduct] now challenged." (*Cassim, supra,* at p. 802.) It must examine "the entire case, including the evidence adduced, the instructions delivered to the jury, and the entirety of [counsel's] argument," in determining whether misconduct occurred and whether it was sufficiently egregious to cause prejudice. (*Ibid.*) "Each case must ultimately rest upon a court's view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control, of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all the circumstances." (*Sabella, supra,* 70 Cal.2d at pp. 320–321, fn. omitted.) "[I]t is only the record as a whole, and not specific phrases out of context, that can reveal the nature and effect of such tactics." (*Id.* at p. 318.)

Defendant argues that we should also conduct an independent review of the first question, whether attorney misconduct existed. It urges—contrary to the trial court's findings—that counsel's arguments did not amount to misconduct. The parties cite no authority on this aspect of the scope of our review.

*Cassim* does not shed light on the issue. There, the trial court had overruled objections grounded on attorney misconduct during argument. The Court of Appeal, however, held that two instances of misconduct had occurred and reversed the judgment. The Supreme Court—without commenting on the scope of review for misconduct findings—reversed the Court of Appeal judgment after finding that the first instance did not constitute misconduct and the second instance was harmless if misconduct were assumed.

We need not wade into these waters and decide whether review of a trial court's finding of attorney misconduct is independent or deferential. Even under independent review, a conclusion that Dopson's argument to the jury amounted to misconduct is unavoidable. We have reviewed defendant's arguments to the contrary. They are unconvincing and do not merit further discussion.

## BACKGROUND

Defendant manufactures electrosurgery units (ESU), which are electrical generators that provide heat to electrocautery devices. Electrocautery devices

are used in tonsillectomies and other types of operations. One such device is called a needlepoint Bovie, a pen-shaped instrument that is used to cut tissue and then stimulate coagulation. A button on the device triggers the cutting function, and another button triggers the coagulation function. Another such device is called a suction Bovie, which removes fluids secreted from tissue. A foot pedal triggers its function. When the functions are triggered, needlepoint from the buttons and suction from the foot pedal, both devices become hot.

Dr. Phan performed a tonsillectomy and adenoidectomy on plaintiff at San Jose Medical Center. Anesthesiologist Dr. Alice Tsao and surgical technician Ramon Beals assisted him. Before the surgery, Dr. Tsao inserted a breathing tube in plaintiff's throat to administer oxygen and anesthetic gas to plaintiff. During the surgery, Dr. Phan used a needlepoint Bovie powered by an ESU manufactured by defendant. While Dr. Phan was using the needlepoint Bovie, a fire occurred in the breathing tube and plaintiff inhaled smoke and suffered burns. Dr. Tsao turned off the oxygen flow, Dr. Phan poured saline solution into plaintiff's throat and sucked it out with a suction device, Dr. Tsao removed the breathing tube, and another anesthesiologist, Dr. Marc Ferrari, inserted another breathing tube and turned on the oxygen. The doctors washed soot from plaintiff's throat and transferred plaintiff to the pediatric intensive care unit. Still later, they transferred plaintiff to Lucile Packard Children's Hospital at Stanford University. Plaintiff suffered brain damage from oxygen deprivation and carbon monoxide poisoning.

Plaintiff sued Dr. Phan for negligence and defendant for (1) negligently designing the ESU, (2) failing to adequately warn about the dangers of using the ESU, and (3) failing to recall or retrofit the ESU. Plaintiff's underlying point against defendant was that the ESU was defective because it allowed simultaneous activation of a needlepoint Bovie and a suction Bovie. According to plaintiff, this increased the risk of fire.

At trial, plaintiff introduced the breathing tube and a burned suction Bovie. The diameter of the hole in the breathing tube was the same as the diameter of the burned suction Bovie. Plaintiff's fire accident reconstruction expert, Vyto Babrauskas, opined that the fire started because defendant's generator activated the suction Bovie and the suction Bovie contacted the breathing tube and created the burn. Plaintiff's product design expert, Joseph Dyro, opined that a single-use ESU was safer than a simultaneous-use ESU because a single-use ESU would prevent two electrodes from being on at the same time. He also reviewed defendant's internal documents, which revealed that defendant had performed a hazard analysis for the European version of the ESU—which recommended, among other things, "to use two generators as a more ideal situation"—and that defendant's American manual for the ESU

did not have any warnings associated with the hazards of simultaneous activation.

Defendant's evidence included tests of the ESU conducted before and after plaintiff's operation that showed the ESU passing every test and testimony to the effect that the ESU had FDA clearance and compliance with national and international safety standards. Other testimony indicated that simultaneous activation was not a defect but rather a beneficial feature for surgeries that require the use of two electrocautery devices simultaneously. In addition, Dr. Phan testified that he did not use a suction coagulator during plaintiff's surgery but used what he uses in all of his tonsillectomies, a baby Yankauer, a device that does not get hot;[2] Beals and a nurse testified that they did not see a suction coagulator used in plaintiff's surgery and had never seen a surgeon use a needlepoint Bovie and a suction device in a patient's mouth at the same time; and Beals testified that the foot pedal to the ESU was not set up for plaintiff's surgery.[3] Defendant also disputed plaintiff's injuries. According to Dr. Tsao, the entire incident lasted seconds, plaintiff was oxygenated throughout the incident, and plaintiff's vital signs remained stable throughout the incident. Plaintiff's doctors testified that plaintiff had no apparent problem three days after the incident, his lung function was normal a month or two after the incident, and his airways were normal two years after the incident. Defendant's expert opined that plaintiff's learning disability preexisted the incident.

Plaintiff argued the following themes to the jury. "How did the fire start? Ladies and gentlemen, there really is only one possible scenario. . . . [¶] Dr. Phan was holding the needlepoint Bovie. He has the needlepoint in his hand. And he's got the retractor in the other. He's got two hands like the rest of us. He's got nothing else he can do. He's got two hands. [¶] Next. [¶] Mr. Beals was holding the suction. He was supposed to be holding the Baby Yankauer says Dr. Phan. But he had to be holding the suction cautery by mistake. He had to be. Nothing else makes sense. I mean, nothing else makes sense. [¶] Next. [¶] Someone stepped on the foot pedal igniting the tube. It certainly wasn't from the tonsil down to there. It certainly wasn't. So somebody had to step on the foot pedal. It's the only thing that makes sense. [¶] Vyto Babrauskas testified about how the physical evidence proves this is [the] only possible scenario that fits the physical evidence and the laws of nature. We're not relying on anybody's recollection about anything on this."

---

[2] Dr. Phan indicated that he uses a suction Bovie after he finishes a tonsillectomy.

[3] Plaintiff asserts in his opening brief that "The assisting surgical technician, Ramon Beals, used a suction Bovie as a coagulator to stop bleeding." But he cites no record reference for this fact. And Beals testified on direct examination by plaintiff's counsel that only the doctor holds a suction device and Dr. Phan did not use a suction cautery during plaintiff's operation. Dr. Phan testified that Beals held the baby Yankauer during the operation and he could not explain how the suction Bovie got burned. Plaintiff's assertion is his inference from the facts.

"Phan was negligent. Who's responsible for this fire? Phan was negligent in allowing two active electrodes in [plaintiff's] mouth." "Dr. Phan is responsible for the negligence of other medical practitioners or nurses—including Mr. Beals—who are under his or her supervision or control and actively participating during an operation." "Dr. Koltai, Dr. Phan's standard-of-care expert, confirmed that it's beneath the standard of care to allow a hot cautery device to come in contact with the [breathing] tube."

Plaintiff, however, attributed "the real fault" to defendant. "[Defendant] was negligent in designing this product with dual activation, not providing adequate warnings. It failed to issue a recall or retrofit campaign prior to April 18th, 2003. Failing to use a foot switch. Failing to have decent accident warnings and communicate to people about the real problems associated with this problem." "[Defendant] acted unreasonably is really what it comes down to. That [defendant] designed the [ESU]. That [defendant] was negligent in designing the [ESU]. It could have been designed a different way that could have avoided the problem." "Plaintiff . . . claims that [defendant] was negligent by not using reasonable care to warn or instruct about the [ESU's] dangerous condition or facts that make this product likely to be dangerous." "[T]he first one that we just went through was what a negligent designer. That was liability based upon a negligent design. [¶] This is liability based upon a separate basis, which is negligently warning about a condition." "Plaintiff . . . claims that [defendant] was negligent because it failed to recall—this is another basis. Hey, you're supposed to recall if you've got a piece of junk that you've sold and you found out it doesn't work." "Ladies and gentlemen, I said this at the outset, there's no medical necessity for allowing dual activation. There's no reason for it. [¶] . . . [¶] If two electrodes are necessary, two machines can be used. That's what our witnesses told you."

Plaintiff urged the jury to apportion 75 to 80 percent of fault to defendant. He asked for damages itemized as follows: future wage loss—$1,791,000; past medical expenses—$93,000; future medical expenses—$867,000; past pain and suffering—$13 million; and future pain and suffering—$13 million.

Dopson began her argument to the jury as follows. "Ladies and gentlemen, thank goodness I finally get to talk to you again. I only get to talk to you twice during the course of the trial—during voir dire and now during closing argument. [¶] . . . [¶] I told you during voir dire that, when you go back and start your deliberations, those of you who have not served as jurors before will find that you have one of the toughest jobs in front of you, one of the most important jobs that you have done for our country. And so you are all very patriotic to be here. And [defendant] thanks you so much for being here. [¶] This is important. And you can't underestimate the importance of what you're doing if you just look at what's going on in our country today. The

important thing is you cannot just repackage the facts and sell them off as if everything is going to be okay because there are consequences to all of us—to you. [¶] So we know that this is about an unfortunate incident. We know that a little boy was involved. Nobody—I think we can all agree—all of us agree that nobody wanted this to happen."

Dopson then pointed out evidence to the effect that the accident at issue was a rare event. She then used the verdict form to suggest that defendant did not negligently design the ESU, give negligent (inadequate) warnings, or negligently fail to recall and retrofit the ESU. She then urged that the evidence showed that the ESU operated as intended and the suction Bovie was not the source of the fire: "Ladies and gentlemen, the eyewitness testimony in this case—the foot pedal accessory was not used during [plaintiff's] tonsillectomy procedure. There was no inadvertent activation by anyone stepping on a foot pedal if the foot pedal was not used. [¶] The eyewitness testimony—the suction coagulator accessory was not used in [plaintiff's] tonsillectomy. The suction coagulator was not, therefore, the source of any ignition of fire. [¶] Now, I should be able to stop right now and go sit down because that's [plaintiff's] entire theory of this case—that there is inadvertent activation of an accessory that was not hooked up and an accessory that was not in plaintiff's mouth. [¶] But I can't sit down because [plaintiff] has crafted a case to fit what he wants. He's crafted it. Why? I think you know. I think you've all heard the term. Two words. Very simple. Deep pockets. [¶] So I'm going to go on. [¶] The testimony—Ramon Beals. He was the surgical technician."

Dopson then recounted evidence to the effect that the ESU in question had been tested by San Jose Medical Center and found to perform within specifications and the ESU's design followed a hazard analysis process that generated mitigation measures and warnings when the mitigation measures became as low as reasonably possible. "This is the same type of process that all manufacturers in the medical device industry have to follow when they develop a new device for which they will seek FDA approval and, in this case, FDA clearance." "The next step is what Dr. Taylor told you—the system architecture document, which describes how the device will function. Based on the initial hazard analysis system architecture document and market requirements document, a design requirement document is developed. [¶] A software requirement specification is generated. And then the team has enough information to develop the design, build several prototypes, conduct testing to determine the issues with the prototypes. And, if there's defects, it goes back to the drawing room. [¶] Ultimately, the product has to go through verification and validation. They then file the FDA documentation seeking clearance for the device. . . . [¶] The medical device industry standard practice. A medical—prescription medical device cannot be sold without at least having FDA clearance. [¶] The FDA has control over all medical device

manufacturers. It is an industry standard for all medical device companies to follow the same steps to get the devices to market. The [ESU] went through this process. [¶] FDA clearance was never revoked." "Dr. Taylor told you that they design the machine to insure that there's no inadvertent activation inside the component—the circuitry of the machine. But there is no way that a design can be made that will account for the inadvertent activation by the person who is holding the device." "The warnings in [defendant's] manual were substantially equivalent to warnings in other operator manuals for similar generators marketed by other ESU manufacturers." Dopson then noted the evidence demonstrating that "There is a whole host of manufacturers that have generators that have the ability for dual or simultaneous activation." She then referred to defendant's warnings contained in the ESU manual such as "Electrosurgery should never be performed in the presence of . . . oxygen-enriched environments. The risk of igniting flammable gases or other materials is inherent [in] electrosurgery and cannot be eliminated by device design." She summarized: "The bottom line is that the risk of fire is a known danger. Physicians who want to be surgeons learn about this in medical school. Electrosurgery should never be performed in the presence of flammable solutions. [¶] There is the risk of igniting flammable gases or other materials. It's inherent in electrosurgery. It cannot be eliminated by design. Physicians learn about it. [Defendant] warned. [¶] The [ESU] meets industry standards. Dual activation is an option that allows two different handheld devices to be operated at the same time. And I think Dr. Taylor also mentioned this: The dual capability is used in cases of open heart surgery, where one surgeon is operating in the chest area; another is operating elsewhere on a patient. . . . [¶] The use of multiple generators in a surgery where two surgeons are operating on a single patient presents potential cross-current error problems for the generators. Dr. Taylor told you that." "The safety of electrosurgery depends critically upon the skill and awareness of the user, a surgeon—and, in this instance, Dr. Phan. He was skillful. And he knew of the risks. [¶] The surgical team in this instance—the anesthesiologist, Dr. Tsao, she told you that at the hospital she had worked in Chicago that she used 21 percent oxygen in the oxygen mix to deliver her anesthesia. So she was knowledgeable. And she told you that she was aware of the risk of fire in electrosurgery situations. [¶] The hospital, San Jose Medical Center, who is no longer around, only provided 100 percent oxygen for Dr. Tsao to deliver in the oxygen mix—did not make 21 percent oxygen or medical room air and oxygen available for Dr. Tsao. [¶] Electrosurgery makes surgical procedures bloodless procedures. Surgeons can use cautery to cut tissue instead of a scalpel. Cautery vaporizes tissue. Cautery coagulates blood vessels as it cuts the tissue. [¶] Why did Dr. Phan make a medical decision to use cautery? Because it's standard practice for tonsillectomy procedures. Cautery made the procedure almost bloodless. Cautery stops bleeding and prevents hemorrhage. Cautery saves lives. [¶] . . . [¶] Electrosurgical units are

prescription medical devices. The physician determines whether or not to use a ESU. The physician is trained about how to use an ESU. A physician is educated about the associated risks of electrosurgery. [¶] . . . Dr. Myer testified and agreed that this is a prescription medical device. And he also agreed that, with respect to ESU that has got dual activation potential, that it is the choice of the physician to use the ESU with dual activation potential or not. The physician [can] always cancel the surgery if he or she does not like the particular ESU."

Dopson then recounted the dispute over the extent of plaintiff's injuries, preexisting medical conditions, and learning disabilities. She suggested that the troubled future painted for plaintiff was not caused by the accident but by his preexisting conditions and his parents' failure to provide plaintiff with special assistance at home and school. "He has a family who has been in this courtroom almost every day. If his family can be in this courtroom almost every day to support him, then certainly they can be at home and support him and make sure he completes the work he needs to complete in order to develop the skills that we all want him to have and that he can have. [¶] And some of us don't learn as fast as others. And [plaintiff] is one of these people. And so what does he need to do in order to learn in order to be able to get to a point with his learning disability where he can go out and work, like we all want him to do? [¶] He needs [to] overlearn. He needs repetition. He needs to learn things, not just from auditory learning, visual learning hands-on learning. He needs to do this. And, with the family support necessary, [plaintiff] can. [¶] And, when you give you[r] verdict in favor of [defendant], ladies and gentlemen, you're not denying [plaintiff]. You're sending a message to this family. And the message is, Help him. Help him learn so that he can learn to help himself." Dopson again emphasized the dispute over the duration of oxygen deprivation and plaintiff's vital signs. She concluded: "I told you, ladies and gentlemen, you would find when you finished your deliberations that the product operated as it was intended. It was not defective in its design. It was not defective due to inadequate warnings. And the benefits of the cautery in surgical procedures outweigh any risks. [¶] Moreover, in this case, ladies and gentlemen, the eyewitness testimony is very clear. There was no suction coagulator in this boy's mouth. And there was no foot pedal set up in this surgical procedure. [¶] There is no way that [defendant] should be in this case. And, when you finish your deliberations, ladies and gentlemen, you will have no choice but to find in favor [of defendant]."

The trial court then excused the jury for the day, and plaintiff objected to Dopson's argument. "There's a number of just—the most flabbergasting breaches of final arguments. Violated case after case after case. [¶] Like the last one—the last one is sticking in my mind a little bit. Send a message to the family. [¶] I can't say send a message to [defendant]. [¶] But she can say send a message to the family with your verdict. What in the world is that? [¶]

There's the deep pockets. The deep pockets. [¶] Your Honor, that's the most classically improper. Both of those are. But deep pockets is so classically improper. You don't know where to begin to address anybody that thinks they can still make that argument in the year 2008. Or is it 1971? That's preposterous with the way she was arguing up there. [¶] She said, [p]recisely said, it affects you the jurors if you give this little boy what he's got coming. [¶] What in the world was that? I mean, there's a mistrial here on a sterling silver platter that I don't want. And this is just an outrage that I can't get a shot at getting my child a fair trial. That's junk. She knows that's junk. [¶] There's nobody in this courtroom that thinks that that's fair argument. That was terrible. Send a message to the family. And it's going to come—money out of your pocket. [¶] Give me a break. I'm just [sic] never been so thunderstruck in my life. I mean, it's not even close. You can't object to junk like that. It's just boom. She says it. [¶] Then, of course, there was the FDA issue, which we've only been around 3,000 times including that jury instruction." "Your honor, I'm trying to think of an appropriate remedy. I've been here for seven weeks—six weeks. And I sure don't want to have a mistrial. [¶] And I really want to think of appropriate remedies. But I don't know what in the world to say to these people. [¶] I got to counter deep pockets. And I don't even know how you do that. That's why it's so ugly. I got to counter send messages. I mean, I should be sending messages to [defendant]. That's what I really want to say. I'm dying to say that. The Court knows that."

The next morning, plaintiff moved for a mistrial conditioned on recovering his costs: "I'm making a motion for a mistrial, Your Honor, with a proviso that's to cost. There is simply no way that these—that we could possibly afford the mistrial unless we get our costs. [¶] There's—we have well over a million dollars in this case. It's cost us a million dollars to try this case. And to do it again is with—without that compensation means that this child has a, you know, strong chance of, even with winning, getting nothing. [¶] So it's a—the bottom line of the argument was that it was impossibly deliberate. It can't be anything else. It absolutely can't be. She—there was an absolute appeal to prejudice that is very difficult to answer because it says, It's going to cost you money. [¶] It says, this is an attorney who has crafted this thing. And it's going to cost you money. And it's only being done because of two words, deep pockets. [¶] And then she goes on to violate yet another principle. She says, Send a message. Everybody knows you can't say, Send a message. [¶] I can't say, Send a message to [defendant]. [¶] She can't say, Send a message to these parents. [¶] It's preposterous that the violation was so clear, deliberate. I don't think there's a lawyer in the state of California that knows—that would say that this isn't deliberate. I don't think there is anybody. It's absolutely deliberate. [¶] And she thinks that she's bulletproof because I won't get a mistrial. I won't ask for a mistrial because she knows the type of money that I got in this case and every time I turn around I got to

fly somebody in from New York. [¶] . . . [¶] I got a fortune in this case. And the cost coming off top. And the chance of this kid getting some money keeps on sinking. So they think I can't ask for a motion for a new trial. When it's that deliberate, it's got to be there."

The trial court denied plaintiff's motion after explaining the following. "First of all, Ms. Dopson, I am not impressed by your argument that two wrongs make a right. What you did yesterday was wrong. Your argument was inappropriate. It was an appeal to the passion and prejudice of the jury. It was clear. [¶] This is not the first time you've done something in this case that has been inappropriate. I'm disappointed. Your conduct is unprofessional. You're an experienced lawyer. You know better. [¶] You have jeopardized your client's interests by what you've done. You're admonished and reprimanded by this Court for your behavior."

Before plaintiff argued his rebuttal to the jury, the trial court instructed the jury as follows: "Members of the jury, although I've instructed you that the statements of the attorneys are not evidence and attorneys speak as advocates in their closing arguments, there are some rules that apply to the presentation of closing argument. [¶] Attorneys are not permitted to what the courts have called passion or prejudice of the jury. [¶] Yesterday, in her closing, [defendant's counsel], you will recall, made certain statements which plaintiff's counsel have rightly brought to my attention that tend to improperly appeal to passion or prejudice. [¶] They include saying that [defendant] is in this case because of deep pockets that you have a stake in the verdict and that you should send a message with your verdict. [¶] These statements are improper. And you are instructed to ignore them. You're instructed to make your decision only on the evidence and the law. [¶] In addition, there may be some confusion in your minds about some terminology that was used about the FDA and approval or clearance. Both terms have been used. And I learned early on in this case that there's a distinctive difference. [¶] So, to clear up any confusion, I will now give you a definition to assist you in reviewing this evidence. FDA approval, which involves a submission to the FDA that requires extensive testing and review, was not sought or received for the [ESU]. [¶] Instead FDA clearance, a more streamlined process, which allows for the marketing of a prescription medical device that is substantially similar to a previously approved device was sought and received for the [ESU]."

The jury returned a verdict against Dr. Phan and apportioned 100 percent of the fault to him. It awarded damages itemized as follows: future wage loss—$399,738; past medical expenses—$23,000; future medical expenses—$201,000; past pain and suffering—$125,000; and future pain and suffering—$0.

As to defendant, the verdict specified that defendant (1) did not negligently design the ESU, (2) did not fail to provide adequate warnings regarding dangers associated with the ESU, and (3) was not negligent in failing to recall or retrofit the ESU.

Plaintiff moved for a new trial as to defendant grounded on attorney misconduct during argument for the "consequences to jurors," "deep pockets," and "send a message" comments. He urged that the "naked appeals to the jurors' passion and prejudice . . . were of such a nature that the curative instruction given by the Court was insufficient to undue [*sic*] the damage Ms. Dopson willfully caused." He argued that it is reasonable to conclude that a verdict more favorable to him would have been reached but for the misconduct because (1) "the jury gave a verdict in [defendant's] favor" and (2) the jury awarded inadequate damages against Dr. Phan, in particular, $0 for future pain and suffering and $0 for past medical expenses paid to the Stanford hospital. Plaintiff's theory was that Dopson so inflamed the jury "so that it would render a small verdict, or nothing at all. That is the exact result she achieved, with a verdict in [defendant's] favor, and an inadequate verdict as against Dr. Phan." According to plaintiff, "the verdict itself . . . is incontrovertible proof of prejudice, despite the admonition."

The trial court denied the motion. It explained: "The conduct of [Ms. Dopson] . . . , during the trial in this case constituted misconduct. However, this court does not believe that Ms. Dopson's conduct resulted in prejudice. The trial jury was admonished extensively by this court immediately following Ms. Dopson's conduct in a prepared written statement that was read to counsel for all parties before it was read to the jury."

## DISCUSSION

Defendant preliminarily argues that plaintiff failed to preserve the attorney misconduct issue by failing to timely object and request an admonition. According to defendant, plaintiff's objection—made after the jury had been excused for the day—came too late. This claim is disingenuous. Defendant failed to raise the timeliness issue below in opposition to plaintiff's motions for mistrial and new trial. We observe that defendant likely so refrained because the parties were proceeding under the trial court's admonition against interposing objections to opening statements and arguments.[4]

---

[4] After the jury had been excused for a lunch break, defendant itself moved for a mistrial following plaintiff's opening statement on the grounds that plaintiff's counsel had exceeded the scope of an opening statement, had been argumentative, and had appealed to the passion and sympathy of the jury. In the dialogue, Dr. Phan's counsel remarked as follows: "Your Honor, the Court has put us in a difficult position because you had indicated in opening statement and closing argument, you didn't want objections. And, frankly, I would have objected to every

As for prejudice, we reiterate that it is not enough for a party to show attorney misconduct. In order to justify a new trial, the party must demonstrate that the misconduct was prejudicial. (*Cassim, supra*, 33 Cal.4th at p. 800.)

As to this issue, plaintiff first contends that each of the three instances of misconduct—the "consequences to jurors" phrase, the "deep pockets" reference, and the "send a message" appeal—is inherently prejudicial. Plaintiff likens the misconduct as examples of "bombshell revelation[s] that could, standing alone, require reversal." (*Cassim, supra*, 33 Cal.4th at p. 803.) He claims that the remarks invoke an antiplaintiff, tort-reform bias with an aim toward jury nullification, which, according to plaintiff, occurred in this case as evidenced by the defense verdict. Plaintiff, however, cites no authority for his proposition.

"Certainly the improper revelation of strongly prejudicial information from outside the record, such as the defendant having compromised with a third party to an accident [citation], or the defendant being insured [citation], can, under some circumstances, alone require reversal. Nevertheless, that [three] instance[s] of attorney misconduct during closing argument could, standing alone, theoretically justify reversal does not mean [defendant's] arguments rose to this level." (*Cassim, supra*, 33 Cal.4th at p. 803.) "[I]t is only the record as a whole, and not specific phrases out of context, that can reveal the nature and effect of such tactics." (*Sabella, supra*, 70 Cal.2d at p. 318.) "Certainly it is not and should not be the law that in every case a reference to the financial ability of the defendant to respond in damages and arguments based thereon may [or may not] be cured by an admonition. Obviously the effect of an admonition upon such misconduct depends upon the facts of each case." (*Hoffman v. Brandt* (1966) 65 Cal.2d 549, 555 [55 Cal.Rptr. 417, 421 P.2d 425] (*Hoffman*).)

For example, in *Nishihama*, the court found that, given the context of the case as a whole and the parties' arguments, counsel's comments that the jury should "send a message" to the defendant—although punitive damages were not recoverable in that case—"were not particularly egregious." (*Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 305 [112 Cal.Rptr.3d 861].) The court also concluded that the attorney's other comments did not rise to the level of putting irrelevant and inflammatory evidence before the jury and then making improper comments based upon

single statement made by [plaintiff's counsel]. But, given the Court's admonishment, I could not do that." Defendant also waited until the jury was excused to make a motion to strike a portion of plaintiff's closing argument. The trial court's modus operandi seems to have been a question asked of counsel, such as the following: "The jury has left the courtroom. [¶] Counsel, is there anything you wish to put on the record before we break?"

that evidence. Finally, the court stated that, while counsel should not have referred to the juror's families and children, the references did not likely impact the verdict.

Plaintiff claims that *Hoffman* supports his proposition that the misconduct in this case amounted to bombshell revelations. He urges: "Thus, where the evidence, even if 'sharply conflicting,' is closely balanced, and there is a direct appeal to the jury to consider the defendant's financial condition, prejudice is established." Plaintiff's reliance on *Hoffman* is erroneous.

In *Hoffman*, counsel for the defendant in a personal injury action argued that, if the jury returned a verdict for the amount sought by the plaintiff, the defendant would have to go to a home for the indigent. On appeal from a defense judgment, the court reversed because of misconduct of counsel during argument. The court held that "The argument was clearly error." (*Hoffman, supra,* 65 Cal.2d at p. 552.) In examining the question of prejudice, the court emphasized the facts of the case: "The evidence, although sharply conflicting in a few respects, presents a closely balanced if not a strong case for recovery. Defense counsel not only improperly referred to his client's financial ability to meet a judgment but also argued that the matter was to be considered by the jury as a factor in its verdict. The court's admonition may have been misleading because, by repeatedly stating that counsel's statements were argument, the court may have left the implication to the jury that the argument was proper. After the admonition, defense counsel returned to the subject. And finally, and probably of most importance, defense counsel's statements contain the implication that there was no insurance, an implication which was false." (*Id.* at p. 555.)

Thus, *Hoffman* involved (1) a closely balanced case, (2) misconduct in referencing financial ability, (3) counsel's argument that financial ability should be considered, (4) the trial court's possible imprimatur on the argument, (5) counsel's repetition of the argument, and (6) counsel's false implication that no insurance existed. The case is therefore consistent with the general rule that "Each case must ultimately rest upon a court's view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control, of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all the circumstances." (*Sabella, supra,* 70 Cal.2d at pp. 320–321, fn. omitted.)

Accordingly, the ultimate decision for this court is to determine whether it is reasonably probable that plaintiff would have achieved a more favorable

result in the absence of that portion of defendant's closing argument now challenged. (*Cassim, supra,* 33 Cal.4th at p. 802.)

"To begin with, the offending argument[s] [were] fleeting, comprising just [15 lines] in the reporter's transcript of a closing argument that covers [40] pages."[5] (*Cassim, supra,* 33 Cal.4th at pp. 802–803.) The offending references were "a mere fraction of counsel's overall closing argument and a miniscule part of the entire [six]-week trial." (*Id.* at p. 803.)

In addition, we have acknowledged that the evidence in this case was conflicting and vigorously contested. But we disagree with plaintiff's implication that the verdict for defendant borders on the incomprehensible.

Plaintiff summarizes his case as follows: "Based upon that fire source and origin expert testimony, which was based solely on the laws of physics and the physical evidence, Plaintiff presented the jury with only one theory of causation from beginning to end of the trial, to wit, the suction Bovie was activated at the same time that the needlepoint Bovie was activated. Activation of the suction Bovie necessarily required actuation by the foot switch. That was negligence."

That Dr. Phan was negligent is confirmed by the verdict. But it does not necessarily follow that defendant's ESU was defective because the device allowed Dr. Phan to activate two electrodes at once. Defendant's evidence supported that simultaneous activation was a beneficial feature rather than a defect. Defendant's evidence supported that multiple single-activation ESU's can be dangerous. Defendant's evidence supported that a physician knows of the fire risk during electrosurgery. Defendant's evidence supported that this risk is enhanced in oxygen-enriched environments and Dr. Phan operated on plaintiff in an oxygen-enriched environment.

Thus, one can logically conclude that Dr. Phan negligently used a suction Bovie without having to conclude that defendant's ESU was defective

---

[5] The "consequences to jurors" comment is six lines: "This is important. And you can't underestimate the importance of what you're doing if you just look at what's going on in our country today. The important thing is you cannot just repackage the facts and sell them off as if everything is going to be okay because there are consequences to all of us—to you." The "deep pockets" reference is four lines: "But I can't sit down because [plaintiff] has crafted a case to fit what he wants. He's crafted it. Why? I think you know. I think you've all heard the term. Two words. Very simple. Deep pockets." The "send a message" statement is five lines: "And, when you give you[r] verdict in favor of [defendant], ladies and gentlemen, you're not denying [plaintiff]. You're sending a message to this family. And the message is, Help him. Help him learn so that he can learn to help himself."

because the ESU's simultaneous-activation feature allowed Dr. Phan to use the suction Bovie while he was using the needlepoint Bovie.

■ Finally, "we also consider the ameliorating effect of the trial court's instructions to the jury to guide its decisionmaking. Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed' . . . ." (*Cassim, supra*, 33 Cal.4th at pp. 803–804.)

As noted, the trial court specifically instructed the jury that the statements of counsel were not evidence, instructed the jury that the three remarks were improper, admonished the jury to ignore the remarks, and instructed the jury to make its decision only on the evidence and the law. Plaintiff cites nothing in the record that convinces us against adhering to the presumption that the jury followed the instruction. His entire argument on this point is as follows: "Here, there are multiple contrary indications in the record. [Defendant] achieved a defense verdict despite a strong liability case. [Plaintiff] was not compensated for his undisputed Stanford bills. No compensation was given for future non-economic damages." But no defense verdict is safe if the verdict itself indicates that the jury failed to follow the legal limitations of its instructions to ignore misconduct. And plaintiff's theory that the jury awarded inadequate damages against Dr. Phan because defendant engaged in misconduct during argument, which, in turn, indicates that the jury did not follow the instruction as to defendant, is pure speculation rather than an indication in the record that the jury did not follow the legal limitations of its instructions to ignore misconduct. We also note that the premise of this theory is itself weak given that plaintiff unsuccessfully moved for a new trial against Dr. Phan on the ground of inadequate damages. We acknowledge that plaintiff appealed from the judgment as to Dr. Phan and then settled with him. And we understand that plaintiff disagrees with the trial court's new trial decision as to Dr. Phan. But the point is simply that reasonable people might disagree about plaintiff's inadequate-damages issue and, therefore, the issue is a weak foundation for plaintiff's theory that the damage award against Dr. Phan demonstrates that the jury did not follow the instruction to ignore misconduct as to defendant. And, again, the theory is a speculative one in any event.

■ Considering the brevity of the offending arguments, the logical path to a defense verdict, and the ameliorating effect of the trial court's instructions, we conclude that defendant's argument did not result in a miscarriage of justice under article VI, section 13 of the California Constitution because it is not reasonably probable that plaintiff would have obtained a more favorable verdict as to defendant in the absence of the argument. Any error was thus harmless.

## DISPOSITION

The judgment is affirmed.

Rushing, P. J., and Elia, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 23, 2012, S201749.