Filed 1/28/25  Estate of Combs CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| Estate of JIMMIE D. COMBS, Deceased. | |
| DANIELLE SMITH, as Administrator, etc.,<br><br>        Petitioner and Respondent,<br><br>v.<br><br>STACEY WILSON,<br><br>        Respondent and Appellant. | A168896<br><br>(Alameda County<br>Super. Ct. No. RP17861683) |

The decedent, Jimmie D. Combs, owned real property in Oakland. After Combs's death, one of her granddaughters – appellant Stacey Wilson – claimed ownership of the property based on a grant deed she had Combs sign in 2009.  Another granddaughter – respondent Danielle Smith, as the administrator for Combs's estate – challenged the grant deed in a petition filed in 2018 pursuant to Probate Code section 850.[1]  The trial court ruled that the grant deed was void due to undue influence and constructive fraud. Wilson appeals, contending:  (1) the court erred in ruling that she was

---

[1]     Except where otherwise indicated, all statutory references are to the Probate Code.  Because Danielle Smith and her mother, Joyce Smith, have the same last name, for clarity we will refer to them by their first names, while referring to other individuals primarily by their last name.

1

estopped from asserting a statute of limitations defense; (2) the court abused its discretion in admitting into evidence a redacted settlement offer; (3) Danielle's attorney committed misconduct; and (4) Danielle is precluded from obtaining equitable relief under the unclean hands doctrine. She also argues that, if a new trial is granted, she has evidence that refutes the undue influence and constructive fraud findings. Finally, she raises matters that are not properly before this court. We will affirm the order.

## I. FACTS AND PROCEDURAL HISTORY

Danielle filed a Petition for Letters of Administration in the Estate of Jimmie D. Combs in May 2017. The trial court granted the petition and issued Letters of Administration to Danielle.

In May 2018, Danielle filed a Report by Administrator to Establish Estate's Claim of Ownership to Property and for Order Directing its Transfer to Estate. The petition, seeking relief under section 850, challenged the validity of a grant deed that Combs had signed more than eight years earlier (850 Petition).[2] As amended during trial, the 850 Petition alleged causes of action for fraud, lack of capacity, undue influence, lack of delivery of the deed, voidness due to alteration, and constructive fraud. It also alleged a general section 850 claim based on voidability.

Wilson opposed the 850 Petition and alleged 21 affirmative defenses, including unclean hands, laches, consent and waiver, unjust enrichment,

---

[2] In September 2018, Wilson petitioned for bankruptcy protection to deal with debts unrelated to the Property, resulting in an automatic stay of these proceedings. The bankruptcy court later denied Danielle's motion for relief from the stay to seek damages or attorney fees and costs, but it allowed an in rem proceeding to determine the validity of the Grant Deed and the ownership interests of Combs's heirs.

2

equitable offset or contribution, and expiration of the statute of limitations. A bench trial took place on March 14–16, 2023.

### A. Trial Evidence

#### 1. Family Background

Combs, affectionately known as "Big Mama," owned a home in Oakland, California (the Property), where she lived with her adult children, Charles Grant, Jr. and Joyce. Grant lived in an outbuilding in the rear of the Property, while Joyce lived with Combs in the primary residence.

Combs had four grandchildren. Three of them – Wilson, Danielle, and Odetta Hill – were born to Joyce. The fourth grandchild, Paula Turner, was born to Grant.

#### 2. The 2008 Alzheimer Diagnosis

Over the years, Combs's physical and mental health declined, and she became reliant primarily on Wilson and Joyce. In 2008, Wilson and Joyce were managing Combs's financial affairs and writing checks for her.

Wilson and Joyce were also present during Combs's visit with a neurologist, Dr. Joseph Philip Seab, in March 2008. In his ensuing report, Dr. Seab diagnosed Combs with Alzheimer's disease, prescribed medication for her, and determined that she was unable to manage her personal or financial affairs by herself, noting that she lacked insight into her deficits. According to the report, Wilson and/or Joyce had apprised Dr. Seab of several concerns, including that Combs had memory problems for about a year, "forgets within seconds," "eats very little," "refuses to bathe," asks a daughter or granddaughter to write checks and then asks why they are writing them, displays paranoia, "thinks her children want to put her away," "gets depressed and [cries] a lot," and may not be consistently taking her medication.

3

### 3. The 2009 Grant Deed

Aware of Combs's mental and physical state, Wilson prepared a grant deed by which Combs would convey all her interest in the Property to Grant, Joyce, and Wilson (2009 Grant Deed or Grant Deed). Combs signed the Grant Deed on February 24, 2009.

Wilson, a licensed real estate salesperson, testified that she thought she had drafted a joint tenancy deed that would result in her receiving fee title upon the death of Grant and Joyce. Under that arrangement, Wilson would be the *only* grandchild of Combs to receive any ownership interest in the Property. Wilson did not, however, inform Combs that she was signing a joint tenancy deed.[3]

### 4. Testimony About Combs's Intentions

Combs's grandchildren and Wilson's son testified about Combs's stated intentions regarding the Property. Wilson, her son, and Hill testified that Combs's primary concern was to keep the Property in the family and believed this could be accomplished best with Wilson on the title. Danielle and Turner emphasized that Combs wanted the Property to go to her children, Grant and Joyce, and, upon their death, to all her grandchildren.

#### a. *Wilson*

Wilson testified that Combs stated "[o]n and off for years" that "she didn't want her house tied up and [that] she wanted the house out of her name." Combs told her, "Don't lose my house." Wilson believed that Combs trusted her as the most responsible member of the family. Wilson maintained that "if something were to go wrong, which [Combs] anticipated

---

[3] The 2009 Grant Deed did not create a joint tenancy with the right of survivorship, but a tenancy in common by which Grant, Joyce, and Wilson each held a one-third interest that would pass to their respective successors.

4

would go wrong, she trusted me to be the person to correct it.  I made her a promise.  I know what she went through.  I know what the home meant to her.  And it's – I would like to keep it in the family.  And it's important to me."

Wilson claimed that she never talked to Combs or Joyce about the 2009 Grant Deed after the signing date.  She claimed to have told Danielle about the Deed "shortly []after" its execution in 2009 – a proposition Danielle would later deny.

### b.  Odetta Hill

Hill recalled that she was "in the home" when the 2009 Grant Deed was signed.  But she was not "in on the business that they were in," did not review the instrument, and did not think Wilson "really explained anything."

With respect to Combs's intentions for the Property, Hill testified that: "[Big Mama] wanted to have . . . [Wilson's] name on the [title to the] house because she [was] just [] really adamant about" not losing the house and keeping it in the family.  Hill did not testify, however, that Combs intended for the Property to be owned solely by Wilson to the exclusion of the other grandchildren.  Indeed, Wilson never told Hill that Wilson was an owner of the Property.

### c.  Ramel George, Jr.

Wilson's son, Ramel George, Jr., testified that he overheard conversations between Combs and Joyce and/or Wilson regarding the Property.  He perceived that Combs wanted to keep the Property – her prized possession – in the family.  She "didn't trust her two kids [Grant and Joyce] to take care of business of the house . . . [and] wanted to make sure that the house wasn't lost."

When asked if he had "ever heard any conversation or [been] privy to any conversation" regarding whether Wilson wanted to own the Property, George testified: "Not to own by herself. It was more to keep the house in our family. So that was always [] Combs'[s] biggest issue is she did not want the house to leave the family. So that was her instructions to [Wilson], so. And if that means owning the house so that it stays with the family, then yes. But if it means to own the house so no one else has it, then no."

### d. *Danielle and Turner*

Danielle testified that Combs was clear that when she died, the Property was to go to Combs's two children, and then to her four grandchildren.

Turner, Grant's only daughter, similarly testified that Combs "always said the [Property] would always be left to her two children, and if something happened to them, then it would go to all the grandchildren." Upon examination by the trial court, Turner stated that her father (Grant) believed he and Joyce owned the Property after Combs's death; he never indicated that Wilson was an owner.

### 5. Combs's 2009 Death and the 2014 Deeds

Combs died in November 2009 at the age of 86. After Combs's death, Wilson took the Grant Deed from Combs's lockbox to the Alameda County Recorder's Office. Before recording the Grant Deed in April 2010, she added a handwritten legal description of the Property and indicated a transfer tax exemption applied under the Revenue and Taxation Code for a "gift."

Grant and Joyce continued to live at the Property until Grant died in August 2011. During that period, Wilson did not live at the Property and did not act in a manner consistent with ownership, such as charging rent or paying for expenses associated with the Property (other than assisting Joyce

6

with payments). After Grant's death, Joyce lived at the Property alone until 2013, when Wilson moved in to care for her.

Wilson also knew that Joyce had fallen behind on the mortgage payments. At some point, a Notice of Sale was posted on the door of the Property. Wilson tried to resolve the pending foreclosure and, during that process, realized that the Grant Deed she had drafted was not a joint tenancy deed after all. Wilson and Joyce attempted to assume the mortgage, but they ran into difficulties because a deceased person (Grant) was still listed on the title and all owners needed to be on the loan.

Grant was survived by his daughter, Turner. Wilson did not include Turner in the loan-assumption process. But at trial, Wilson claimed that the process required Turner to relinquish her ownership interest in the Property.

Wilson showed up for Turner's birthday party in 2013 and told her that they needed to act to avoid foreclosure on the Property and that Wilson would follow up with documents. On January 14, 2014, Wilson met Turner in Tracy and presented a filled-out quitclaim deed, transferring her interest in the Property to Wilson and Joyce, along with an Affidavit Re Real Property of Small Value (Form DE-305). Wilson convinced Turner to sign the documents before a notary and then had them recorded. Wilson testified that she was merely trying to "save" the Property from foreclosure, although she did not disclose to Turner that Turner would be giving away her entire interest in the Property for nothing.

Turner testified that she signed the quitclaim deed and Form DE-305 affidavit because she believed she was saving the Property from foreclosure. She confirmed that Wilson did not disclose that Turner was relinquishing her interest in the Property. She understood from Wilson that the Property would pass to or be discussed with the four grandchildren.

7

After Wilson convinced Turner to sign the quitclaim deed, Wilson and Joyce executed a grant deed on April 15, 2014 (2014 Grant Deed), purporting to create a joint tenancy with the right of survivorship. Wilson acknowledged that, by then, she had learned her lesson about joint tenancies. Wilson did not disclose the 2014 Grant Deed to Turner.

Joyce died in February 2016, and Danielle thereafter suggested to Wilson that the Property be sold. Wilson responded that the Property would not be sold, proclaiming that she was the "remaining surviving owner." Danielle testified that she had not heard about the 2009 or 2014 Grant Deeds or Wilson's ownership of the Property before then.

### 6. 2016 Voiding of the 2014 Deeds

In May 2016, Danielle filed a petition for probate of the Estate of Joyce Smith (Alameda County Superior Court Case No. RP16815511), and Turner filed a petition for probate of the Estate of Charles A. Grant (Alameda County Superior Court Case No. RP16815520). Wilson objected to both petitions because they alleged that the estates owned real property valued at $300,000, presumably referring to the Property. She alleged that the Property was instead "owned by objector [] Wilson."

Following an evidentiary hearing on November 22, 2016, the trial court overruled Wilson's objections. The court found that the quitclaim deed executed by Turner was "void as it was obtain[ed] by fraud." Further, the court found that the 2014 Grant Deed – which purportedly created a joint tenancy in favor of Wilson and Joyce – was "void as it is not a grant deed from those having the legal right to execute such a[] deed." The court appointed Turner to be the personal representative of the Estate of Charles Grant, and Danielle to be the personal representative of the Estate of Joyce Smith.

8

Notwithstanding the trial court's November 2016 order, at the trial on the 850 Petition, Wilson denied defrauding Turner. She admitted, however, that the court had found that she failed to provide Turner with sufficient information.

7. <u>Wilson's Settlement Letter</u>

On March 8, 2023, roughly one week before the trial on the 850 Petition, Wilson emailed Alexander Biddle (who was Danielle's attorney), Turner, and Hill, attaching a March 7, 2023 letter that purported to be her settlement offer to Danielle, Turner, and Hill. A redacted version of the letter was admitted into evidence as Exhibit P-6 over Wilson's objection.

Left unredacted in Exhibit P-6 were two columns of numbers purporting to show the amounts that Wilson and the addressees would receive if Danielle won the lawsuit compared to the much greater amount they would receive if Wilson won. Wilson explained that if Danielle prevailed, Biddle would receive $160,000 (40% of the gross value of the Property), so Turner would receive only $990.79 and Wilson, Danielle, and Hill would each get just $330.27. Wilson asserted: "if Danielle wins her lawsuit and Big Mama's February 24, 2009 deed is voided, each of us will receive far ***<u>less</u>*** than if I win the lawsuit and Big Mama's February 24, 2009 deed is valid. Even more upsetting, if Danielle wins her lawsuit[,] a group of attorneys Big Mama did not know and would ***NEVER*** have hired will receive almost ***one hundred sixty-one (161) times more*** than [Turner], and almost ***four hundred eighty-five (485) times more*** than Danielle, [Hill] and me." (Italics, bolding, and capitalization in original.)

9

Biddle replied by email, pointing out inaccuracies in Wilson's assumptions.[4] The next day, Wilson circulated a revised settlement offer based on Biddle's assertion that his fees were to be just 33% of the net recovery. Neither the revised settlement offer nor the email exchange were offered into evidence.

At trial, Wilson admitted that she told Hill, before her trial testimony, that Hill would receive only $330 if Danielle prevailed. Hill claimed not to recall Wilson telling her how much Biddle would receive if Danielle won.

B. Trial Court's Ruling on the 850 Petition

The trial court issued its final Statement of Decision in August 2023, voiding Combs's transfer of the Property pursuant to the 2009 Grant Deed. The court found that Danielle was "credible" and "honest and sincere," and that she "did not appear to overstate the causes and reasons for her delay in bringing this action." By contrast, it found Wilson "less credible." The court found believable Turner's testimony about the 2014 title instruments and the statements by Wilson that induced Turner to sign those instruments. The court concluded that George was "generally credible" as well.

As to Danielle's claims, the trial court ruled that Wilson exerted undue influence in obtaining Combs's signature on the 2009 Grant Deed. In the

---

[4] Although not admitted into evidence, Biddle's email asserted, among other things, that "[t]he court-approved contingency agreement is for 33% of the net, not 40% of the gross sales price, so the numbers there are calculated incorrectly." The attorney-client agreement states that Biddle's compensation is a "percentage of the 'net recovery,' depending on the stage at which the settlement or judgment is reached." As stated in the agreement, "[t]he term 'net recovery' means: (1) the total of all amounts received by settlement, arbitration award or judgment, including any award of Attorneys' fees, (2) minus all costs and disbursements set forth in Paragraph 7. [Net recovery shall also include the reasonable value of any non-monetary proceeds.]"

court's view, a presumption of undue influence arose because: (1) Combs and Wilson shared a confidential relationship and a special relationship of trust, in that Wilson helped manage Combs's property and personal affairs; (2) Wilson received an undue benefit by obtaining a share of Combs's estate equal to that of Combs's children and greater than her other grandchildren; and (3) Wilson actively participated in procuring or executing the Grant Deed by preparing the instrument and coordinating its signing. Apart from this presumption, the court alternatively found that there was clear and convincing evidence of undue influence. Combs, diagnosed with Alzheimer's disease and effectively dependent on others for most activities of daily living, was a vulnerable victim. Wilson had apparent authority, in that she effectively controlled everything about the drafting and execution of the Grand Deed. Wilson presented herself as successful and concerned for Combs's family, resisted conversations regarding execution of a power of attorney or will, and used "we" when testifying about Combs's affairs, all of which confirmed for the court that Wilson "more likely than not conflated and projected her own self-interest upon the vulnerable decedent." Finally, the Grant Deed was inequitable to Combs, her children, and Combs's grandchildren other than Wilson.

The trial court also found constructive fraud. As the court explained, Wilson was in a confidential relationship with Combs, she purported to act for Combs's benefit in preparing the 2009 Grant Deed, she knew or should have known that she received an unnatural benefit to the exclusion of the other grandchildren, she misled Combs and her successors by implying a benefit of " 'family' " ownership, and her misleading information was a substantial factor in causing harm to Combs and other family members.

11

Regarding Wilson's statute of limitations defense, the trial court found that the 850 Petition was filed after the limitations period expired for claims challenging the validity of the 2009 Grant Deed (citing Code Civ. Proc., §§ 318, 319, 366.1, and 377.10).[5]  However, the court further ruled that Wilson was equitably estopped from invoking the statute of limitations.  In support of this ruling, the court noted that Combs was not inclined to engage in post-death planning, Wilson "consistently used ambiguous statements and misstatements to lure [Danielle] and her predecessors in interest to believe that 'the family' would retain ownership of the [Property]," Danielle and her predecessors (including Combs and Joyce) relied upon Wilson's statements implying collective ownership in not filing suit, and Danielle filed her petition with reasonable diligence after discovering the facts and circumstances giving rise to the disputed ownership.

The trial court rejected Wilson's other defenses.  Her unclean hands defense was deemed to be "perfunctory and not applicable."  Laches did not apply because Danielle was reasonably diligent in bringing her claims, and Wilson cannot benefit from her own wrongful conduct.  There was no waiver of or consent to Wilson's conduct because Danielle, her predecessors, and Turner all reasonably relied on Wilson's misleading statements, which conveyed collective family ownership and failed to disclose that Wilson's

---

[5]     (See Code Civ. Proc., §§ 318 [to recover possession of real property, the plaintiff, ancestor, predecessor, or grantor must have possessed the property within five years before the action commenced], 319 [same rule for recovering title to real property], 366.1 ["If a person entitled to bring an action dies before the expiration of the applicable limitations period, and the cause of action survives, an action may be commenced before the expiration of the later of . . . [s]ix months after the person's death . . . [or] [t]he limitations period that would have been applicable if the person had not died"] & 377.10 [definition of beneficiary of decedent's estate].)

ownership was for Wilson's sole benefit and to the exclusion of Combs's other lineal decedents. In addition, Wilson failed to establish the specific amount to which she was entitled for unjust enrichment or an offset, so the court denied her request without prejudice.

Wilson filed a notice of appeal, challenging the Statement of Decision (Case No. A168896). The trial court thereafter entered judgment, which essentially confirmed the Statement of Decision. Wilson timely filed a notice of appeal from the judgment (Case No. A169351). We granted the parties' motion to consolidate the appeals.

## II. DISCUSSION

### A. Estoppel to Assert a Statute of Limitations Defense

Wilson contends the trial court erred by finding she was estopped from asserting a statute of limitations defense because there was no evidence she induced Combs's heirs not to sue. We are not persuaded.

#### 1. Statute of Limitations

As a threshold matter, we question whether Danielle's claims were even time-barred. Wilson's trial brief and the statement of decision relied on Code of Civil Procedure sections 318 and 319, which provide that actions relating to the possession of, or the title to, real property must be commenced within five years after the end of the possession of the property by the claimant or the claimant's predecessor in interest. (See *Robertson v. Superior Court* (2001) 90 Cal.App.4th 1319, 1327 (*Robertson*).) According to Wilson's trial brief, the limitations period therefore expired in February 2014, five years after the Grant Deed was signed. In this court, Wilson similarly argues that any claims of Combs passed to Joyce and Grant (Code Civ. Proc., § 377.30), who were subject to the same statutes of limitation as Combs (Code

13

Civ. Proc., § 366.1), so any claims as to the Grant Deed were barred by the statutes of limitations before Joyce died in February 2016.

Wilson's analysis is deficient because Code of Civil Procedure sections 318 and 319 run not from the date the instrument was signed, but from the last date the claimant (or predecessor in interest) possessed the property – an issue that Wilson did not brief in the trial court or here. (See, e.g., Code Civ. Proc., § 319 ["No cause of action . . . arising out of the title to real property . . . can be effectual, unless it appear that the person prosecuting the action . . . or under whose title the action is prosecuted . . . *or the ancestor, predecessor, or grantor of such person* was seized or possessed of the premises in question within five years before the commencement of the Act in respect to which such action is prosecuted or defense made" (italics added)].) While we are not informed when the Property was last possessed by Danielle's predecessors, we note that Combs passed away in November 2009 and Joyce, who continued to live at the Property and is recognized by the trial court and the parties as Danielle's predecessor in interest, did not pass away until February 2016. Thus, if Joyce was Danielle's predecessor in interest, then the five-year statute of limitations found in Code of Civil Procedure sections 318 and 319 arguably did not begin to run until 2016.

Moreover, *Robertson* (which Wilson cited to the trial court) involved setting aside a deed due to *incompetence*. (*Robertson, supra,* 90 Cal.App.4th at pp. 1321–1322.) *Robertson* indicated that the applicable limitations period when setting aside a deed due to *fraud* – as here – is not Code of Civil Procedure sections 318 or 319 but Code of Civil Procedure section 338, subdivision (d). (*Robertson*, at pp. 1326–1327; see *Zakaessian v. Zakaessian* (1945) 70 Cal.App.2d 721, 725 [if fraud or mistake is involved, Code of Civil Procedure section 338, subd. (d) would apply to a request to set aside and

14

cancel an instrument].)  Code of Civil Procedure section 338, subdivision (d) provides for a three-year limitations period and specifies that the cause of action "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."  Wilson does not address when Danielle (or her predecessors in interest) discovered the facts constituting the alleged constructive fraud.  According to Danielle, she did not learn about Wilson's claim to exclusive ownership until their conversation after Joyce's death in February 2016, less than three years before she filed her 850 Petition.

Nonetheless, the trial court found that Danielle's claims were time-barred in its Statement of Decision, and Danielle does not contend that the court was mistaken on this point.  We therefore turn to the estoppel issue.

### 2. Estoppel

Even if the 850 Petition was untimely filed, Wilson fails to establish that the trial court erred in ruling that she was estopped from asserting a statute of limitations defense.

On appeal from a judgment based on a statement of decision after a bench trial, we review the court's findings of fact for substantial evidence. (*McPherson v. EF Intercultural Foundation, Inc.* (2020) 47 Cal.App.5th 243, 257 (*McPherson*).)  " 'We may not reweigh the evidence and are bound by the [] court's credibility determinations.' . . . 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' "  (*Ibid.*)

An estoppel in this context arises where (1) the defendant's words or conduct before the expiration of the limitations period misled the plaintiff into believing it was unnecessary to file a lawsuit, and (2) the plaintiff reasonably relied on the defendant's words or conduct in not filing the lawsuit

15

by the expiration of the limitations period.  (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 384; *Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 43; see CALJIC No. 456.)

Here, Wilson challenges the trial court's finding that she "consistently used ambiguous statements and misstatements to lure [Danielle] and her predecessors in interest to believe that 'the family' would retain ownership of the [Property] . . . implying collective ownership."  She contends there is "not a shred of evidence" that she made such a statement, or that Danielle or her predecessors refrained from suing in reliance on such a statement.

Wilson is incorrect.  While Wilson never admitted at trial that she told family members that the Property would remain in the family with "collective ownership" – that is, owned by all the grandchildren after Joyce and Grant passed away – a reasonable inference from the evidence is that her words and conduct, during and after the limitations period, led to that understanding and that her family members relied on that understanding in refraining from filing a lawsuit earlier.

First, substantial evidence supports the conclusion that Combs always wanted the Property to pass to her children and eventually to *all* her grandchildren and that the grandchildren knew this.  Turner and Danielle testified unequivocally to that fact, and the trial court explicitly found them to be credible.  Indeed, neither Hill nor Wilson's son testified that Combs wanted the Property to be owned solely by Wilson or to the exclusion of Combs's other grandchildren.

Second, given Combs's intent for the Property to pass eventually to *all* her grandchildren, it is reasonable to infer that she signed the 2009 Grant Deed with the understanding that the Deed would further (or at least not interfere with) that purpose, even though it listed only one of those

16

grandchildren – Wilson – as a grantee. Based on the evidence, Combs must have reached this understanding due to the words or conduct of Wilson because Wilson alone prepared the Grant Deed and discussed it with Combs, and because Wilson was a person of influence as a real estate professional who helped oversee Combs's personal affairs. It is therefore more than reasonable to infer that Wilson induced Combs to sign the 2009 Grant Deed by causing her to believe that all her grandchildren would eventually own the Property. Despite this, Wilson intended to create and believed that she had created a joint tenancy by which she *alone* would own the property after Grant and Joyce passed away.[6] Thus, the evidence at trial establishes that Wilson, to convince Combs to sign the 2009 Grand Deed, hid her true intent to take the Property for herself, to the exclusion of the other grandchildren.

Third, substantial evidence supports the conclusion that Wilson hid her intent to obtain sole ownership of the Property from Danielle and her predecessors in interest. Indeed, there is substantial evidence that Wilson acted, within the limitations period and beyond, to lull Danielle and her predecessors into thinking that Combs's known desire for all her grandchildren to eventually own the Property would be accomplished. For example, Wilson never told Combs that she was signing a joint tenancy deed that Wilson believed would give Wilson sole ownership of the Property after Joyce and Grant passed away. Wilson also never discussed the 2009 Grant Deed with Joyce. Although Wilson claimed at trial to have told Danielle about the Grant Deed after Combs signed it in 2009, the trial court was free to disbelieve her testimony especially because Wilson had nothing in writing

---

[6] This was, in essence, the basis for the trial court's findings of undue influence and constructive fraud. Although Wilson contends there was contrary evidence, she does not contend specifically that the undue influence and constructive fraud findings were not supported by substantial evidence.

to prove it. The court presumably did so when it found Wilson less credible than Danielle, who insisted that she did not learn about the Grant Deed or Wilson's claim to sole ownership of the Property until February 2016.

Finally, Wilson did not divulge her scheme to others, including the other grandchildren. According to Hill, Wilson never said that Wilson would be the sole owner after Grant and Joyce died or that Wilson was a full or part owner of the Property. Wilson herself admitted that she did not discuss the 2009 Grant Deed with Turner. In fact, she convinced Turner to sign a quitclaim deed without telling her that it would deprive Turner of all her interest in the Property. Wilson did not even tell her son that she wanted to own the Property "by herself." As far as he understood, she wanted to keep the Property in the family but not to "own the house so [that] no one else has it."

Based on the foregoing, substantial evidence supports the conclusion that Wilson's words and conduct, during and after the limitations period, reasonably led Danielle and her predecessors to believe that all of Combs's grandchildren would be joint owners of the Property. With that, there was no need to file suit. Furthermore, ample evidence supports the conclusion that Danielle, once she learned of Wilson's true intentions in February 2016, acted with reasonable diligence by filing a petition to administer Joyce's estate in May 2016, a petition to administer Combs's estate in May 2017, and her 850 Petition to set aside the 2009 Grant Deed in May 2018. Accordingly, substantial evidence supports the trial court's estoppel ruling.

Wilson's arguments to the contrary are not persuasive. She emphasizes her testimony and Hill's testimony that Combs wanted Wilson's name on the 2009 Grant Deed because Wilson was the most responsible and able to keep the Property in the family. That may be so, but it does not mean

18

that Combs intended for Wilson to *own* the Property to the exclusion of her siblings and cousin.  Similarly, while Grant and Joyce were present when Combs signed the Grant Deed and could observe her demeanor, that does not mean that they realized Wilson's intent to use the Deed to divest Grant's only child, and two of Joyce's children, from any ownership of the family home. Wilson further argues that Joyce ratified Wilson's inclusion on the Grant Deed when they assumed Combs's mortgage, but Wilson cites no evidence that Joyce understood the Grant Deed's purported significance.  To the contrary, Wilson testified that she did not talk to Joyce about the Grant Deed.

At any rate, we do not reweigh the evidence.  (*McPherson, supra,* 47 Cal.App.5th at p. 257.)  We determine only whether there was substantial evidence from which a trier of fact *could* reasonably reach the conclusion found by the trial court.  (*Ibid.*)  Here, there was such evidence, and Wilson fails to establish error.

B.  Admission of Redacted Exhibit P-6

Wilson contends the trial court erred by admitting Exhibit P-6 into evidence.  She fails to demonstrate a prejudicial abuse of discretion.

At the outset, it is not entirely clear what was contained in the "Exhibit P-6" that was admitted into evidence.  The exhibits that we received from the trial court include an electronic file labeled "A168896 – Exhibit P6.pdf."  This file includes two versions of Exhibit P-6.  One version, bearing a yellow Exhibit P-6 sticker, consists of a redacted copy of Wilson's March 7 letter.  A second version, bearing a white Exhibit P-6 sticker, includes:  (1) an email trail showing a March 8, 2023 (12:38 p.m.) email from Wilson that attaches her purported settlement letter, Biddle's March 8, 2023 (12:52 p.m.) email pointing out errors in Wilson's calculations, and a March 9, 2023 email from

19

Wilson attaching a "revised settlement offer" in light of Biddle's comments; (2) an unredacted copy of Wilson's March 7 letter; (3) a residential listing for the Property; and (4) Wilson's revised settlement letter of March 8.

According to the reporter's transcript, Biddle provided a redacted version of Wilson's March 7 settlement letter to Wilson and her attorney at trial. Based on this record and the parties' arguments, we assume that the redacted March 7 letter comprises the Exhibit P-6 admitted into evidence. It is fair to say, however, that the trial court had the other documents in its possession and knew of their existence.

### 1. Harmless Error

As mentioned previously, Biddle argued that Exhibit P-6 was "relevant as an attempt to manipulate the witnesses." Wilson objected on the ground that Exhibit P-6 was a settlement offer, but the trial court admitted it as relevant to Wilson's credibility. We, however, need not and do not decide whether the court's admission of Exhibit P-6 was an abuse of discretion. (*People v. Griffin* (2004) 33 Cal.4th 536, 587, disapproved on another ground in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.) Even if the court erred in admitting Exhibit P-6, Wilson has not shown that the error was prejudicial.

The redacted March 7 letter in Exhibit P-6 was labeled a settlement communication but did not disclose a settlement offer or concede any facts. Instead, it consisted of two columns of figures, comparing what Wilson believed would be the recovery for the parties and witnesses (Hill and Turner) if Wilson "win[s] the lawsuit" and what they would recover if Danielle "wins her lawsuit." Wilson argues that this information was not admissible under Evidence Code section 1152 because it was part of the broader settlement communication embodied in the unredacted March 7

20

letter.  As she describes her purported settlement offer in her opening brief, "[Wilson] would buy each co-tenant's interest in [the Property], if they would stipulate that Danielle['s] [] claims were barred by the statute of limitations, thereby preventing up to 40% of Big Mama's equity from being taken by an attorney Big Mama did not know or hire."

But even assuming that Exhibit P-6 was a settlement offer that was not admissible under Evidence Code section 1152, Wilson cannot establish prejudice.  As Wilson points out, the trial court cited the challenged evidence when discussing its finding that Wilson was "less credible" than Danielle.  However, Exhibit P-6 was not the primary reason for the court's finding.  To the contrary, the first event to which the court referred was Wilson's use of "her status as a family member and real estate professional to convince [] Turner to trust in her scheme that (almost) resulted in [] Turner giving up her inheritance from her father and grandmother."  Since the court found Danielle to be "credible," it very likely would have found Wilson "less credible" if there had been only one incident – the one involving Turner – that suggested Wilson's lack of veracity.  In other words, even if the court had not admitted Exhibit P-6, the record indicates it still would have found Wilson less credible than Danielle.

Wilson argues that the admission of Exhibit P-6 was "highly prejudicial" because the trial court relied on it also to discredit Hill's testimony, noting that Wilson and Hill are the only living members of Combs's family who were present during her execution of the Grant Deed.  In this regard, the court observed in its Statement of Decision that it had "concerns about [] Hill's loyalties given respondent Wilson provided [] Hill with false and inaccurate information prior to the trial."  However, while Hill testified that Combs wanted to keep the Property in the family, she did not

21

testify that Combs wanted the Property to be owned solely by Wilson to the exclusion of her other grandchildren. Therefore, whether the court found Hill credible or not, her testimony was not key to the outcome of the case.

### 2. Accuracy of Wilson's Calculations

Wilson also spends many pages arguing that her calculations in Exhibit P-6 were accurate or at least made in good faith. Among other things, she urges that her interpretation of Biddle's fee agreement with Danielle was correct. She adds that the trial court had no way of knowing whether Wilson's settlement offer was made in good faith because Biddle did not provide the court with Wilson's first or second settlement letters.

It is unclear whether Wilson directs these arguments to the admissibility of Exhibit P-6, to the weight of that evidence (that is, whether Exhibit P-6 was sufficient for the trial court to draw its conclusions about her credibility), or to the purported prejudice arising from its admission. Regardless, her arguments miss the mark. Whether or not Exhibit P-6 was properly admitted, its admission was not prejudicial because *other* evidence impugned Wilson's credibility and made her "less credible" than Danielle.

We nonetheless address one of Wilson's arguments in this regard. Wilson challenges the trial court's assertion in the Statement of Decision that she "inaccurately claimed that [Biddle] would receive substantially more than what [] Hill and the other intestate heirs would receive if [Danielle] were to prevail." She argues that "it can be proved with mathematical certainty that if Danielle [] prevails on appeal [] Biddle will in fact receive more than each of the heirs." In our view, however, the court did not mean that Wilson was inaccurate because Biddle could never receive more than Wilson and her sisters, but that there were inaccuracies *in* Wilson's arguments that Biddle would receive more than Wilson and the other grandchildren. Moreover,

22

regardless of the basis for the court's admission of Exhibit P-6, its admission was harmless.

C. Attorney Misconduct

Wilson contends the trial court erred in refusing to consider misconduct by Biddle. She asserts that such misconduct is a ground for a new trial (*Los Angeles v. Decker* (1977) 18 Cal. 3d 860, 870) and that a party does not have to move for a new trial before raising attorney misconduct on appeal (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148 (*Garcia*)). But Wilson fails to establish misconduct that would compel a new trial.

According to Wilson, Biddle committed misconduct by trying to convince the trial court that Wilson attempted to tamper with witnesses "based solely on his own statements and a highly redacted and misleading portrayal of [] Wilson's first settlement proposal, with no *evidence* that any of the estimates or facts in that settlement proposal were inaccurate, or in bad faith." (Italics in the original.)

Wilson's arguments are meritless for several reasons. First, Wilson did not object on the ground of attorney misconduct when Biddle made his arguments for the admission of Exhibit P-6. Nor did she object to the extent of the redaction. Her arguments are therefore forfeited. (See *Garcia, supra*, 204 Cal.App.4th at p. 148.)

Second, Wilson's claim that there was *no* evidence of inaccuracy or bad faith regarding the March 7 letter is incorrect. Among other things, Wilson admitted at trial that she "calculated wrong" in her March 7 letter and, for that reason, circulated a revised letter the next day. There was also arguably evidence of bad faith, at least in regard to sending the March 7 letter to Hill and Turner. Indeed, Wilson's decision to send the letter to Hill and Turner,

two non-party witnesses, could be reasonably construed as an attempt to persuade them to testify in a certain manner so they would get more money.

Third, this is not a situation where a lawyer falsified evidence or concealed it from the trial court or opposing counsel. The parties, counsel, and court knew of the two (unredacted) settlement letters and email chain. Further, the court afforded Wilson the opportunity to rebut Biddle's arguments through Wilson's testimony and counsel's argument. If Wilson believed Biddle's presentation was unfairly one-sided, counsel had the chance to rebut it then. Wilson provides no legal authority for compelling a new trial in these circumstances.

Wilson further argues that Biddle's post-trial briefing was improper. In his post-trial brief, Biddle argued that Wilson tried to manipulate Hill's testimony with the March 7 letter, that Hill claimed at trial that she could not recall if Wilson told her how much Biddle would earn if Danielle won the case, and that Wilson confessed that she did make such a statement. Biddle further challenged the credibility of Wilson's son, noting that he generally claimed to have a hazy recollection of conversations but remembered "snippets in favor of his mother with impeccable clarity." Biddle also criticized Wilson's son for responding to questions with "automated, premeditated" assertions that he did not recall or was "too young" at the time of the events.

Wilson responded by filing an offer of proof with the trial court, enclosing a declaration with copies of her settlement letters and provisions of Biddle's contingency fee agreement as well as Biddle's March 8 email (which she claimed was an impermissible communication to a represented party). Wilson urged that Biddle misstated her son's age in criticizing him for claiming he was too young to recall. She asked the court to examine Biddle

24

under oath regarding his representations, including his purported failure to advise the court of Wilson's second settlement proposal.

Danielle objected to Wilson's offer of proof. The trial court found Wilson's "post-submission filing to be improper" and struck the "belated-post submission filing . . . in its entirety."

Wilson insists that Biddle's post-trial brief was prejudicial "in the extreme" because it changed the trial court's mind. At trial, after Wilson testified that she initially thought Biddle would receive 40% of the reasonable value of the Property and then corrected it to be 33% of the net proceeds, the court stated, "nothing that I've heard makes me think that this was intentional." But after post-trial briefing, the court ruled in its Statement of Decision that Wilson's communication with Hill was "witness tampering" and discredited Wilson's and Hill's testimony. Wilson blames this on Biddle's post-trial brief.

Wilson's position is untenable. In the first place, Wilson's offer of proof was stricken, and she does not demonstrate that the trial court's ruling was erroneous. In any event, she fails to establish prejudicial attorney misconduct. Biddle's post-trial brief characterized the evidence pertaining to witness credibility but did not go so far as to constitute misconduct. Moreover, to the extent there was any inaccuracy in Biddle's depictions of the evidence, there is no indication that it interfered with the court's determination of the facts or its ultimate decision. For example, despite Biddle's challenge to the believability of Wilson's son, the court in its Statement of Decision found him to be "generally credible." Further, differences between a court's initial observations about the evidence during a trial and its final rulings in a statement of decision are generally attributable to the court's opportunity to reflect on the evidence. Here, the court stated at

trial that it did not think Wilson had intentionally misrepresented the amount of potential recovery in the first settlement offer, but that is not inconsistent with the court's later conclusion that sending the letter to Hill could be perceived as an attempt to shape witness testimony. Wilson fails to demonstrate the need for a new trial. (*Garcia, supra*, 204 Cal.App.4th at p. 149 ["In order to justify a new trial, the party must demonstrate that the misconduct was prejudicial"].)

D. Unclean Hands

In its Statement of Decision, the trial court ruled that Wilson's unclean hands defense was "perfunctory and not applicable." Wilson nonetheless argues that Danielle had "unclean hands" because she made "false allegations under penalty of perjury, [and her] attorney engaged in improper direct communication with [] Wilson regarding her first settlement proposal [and] intentionally failed to advise [the court] of [] Wilson's second settlement proposal." She contends that Danielle is therefore not entitled to equitable relief. Her argument is meritless.

As to Danielle's purportedly false allegations, Wilson points to assertions in four verified petitions that Danielle was "informed" that Wilson defrauded Combs by falsely telling her that Wilson's name on the deed "would not result in [Wilson] obtaining a one third interest in the Oakland Property." Wilson contends the trial showed that Danielle had no such "information" and that she simply made it up. Further, Wilson argues, Danielle's four verified petitions falsely alleged she had "information" that Combs placed Wilson on the 2009 Grant Deed only to "effectuate the equal transfer of ownership to" Joyce and Grant. In essence, Wilson argues that Danielle had insufficient basis for making her allegations on information and belief. (See *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 550.) Her

26

argument, however, is unavailing: Danielle prevailed at trial based on the evidence, not on the allegations made in her petitions.

As to Biddle's communication with Wilson about her first settlement proposal, Wilson urges that his direct communication with a represented party violated Rule 4.2 of the Rules of Professional Conduct (Rule 4.2). Rule 4.2(a) states: "In representing a client, a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer." The rule applies even if the represented person initiates or consents to the communication. (Rule 4.2, Comment [1].) Danielle argues that Biddle was replying to a communication sent to him with a "cc" to Wilson's attorney (Kellan Patterson), who never objected to the communication, and Biddle understood he had "implied consent" to do so. As Wilson points out, however, Biddle responded to Wilson only 14 minutes after Wilson sent her email, so he could not have known whether Patterson saw the email, let alone consented to Wilson chatting with opposing counsel a few days before trial. Nevertheless, Wilson provides no legal authority for the proposition that Biddle's conduct constitutes unclean hands that would deprive Danielle of recovery.

As to Wilson's argument that Biddle failed to advise the trial court of Wilson's second settlement proposal, the court was aware of the second settlement proposal. Wilson discussed it in her trial testimony, Wilson could have offered it into evidence at trial but chose not to, and an unredacted copy was in the court's possession. Wilson fails to establish any basis for reversal.

27

E.  <u>Wilson's Undue Influence and Constructive Fraud</u>

Wilson contends that, in the event of a new trial, Wilson has enough evidence to establish that she did not exercise undue influence or commit constructive fraud.  Her contention is misplaced.

To the extent Wilson is arguing that we should grant a new trial because there is evidence in her favor, we do not grant new trials or reverse judgments on that ground.  To the extent Wilson is arguing that, if there is some other ground that potentially warrants a new trial, a new trial should be granted because there is a reasonable probability that she would obtain a better result, Wilson fails to establish any error that would potentially warrant a new trial.

F.  <u>Attempts to Recover Damages, Penalties and Attorney Fees</u>

Wilson next contends that Danielle's efforts to recover monetary damages, penalties, and attorney fees from Wilson are barred by the bankruptcy court's order precluding her from seeking monetary relief.   She urges that attempts to recover those amounts "must be denied."

We review decisions made by the trial court.  The court in this case did not order recovery of damages or other amounts.  To the contrary, the Statement of Decision ruled: "The court *denies* without prejudice the request to allocate fees and costs related to the subject petition to respondent Wilson.  First, doing so may be an indirect way of awarding damages against respondent Wilson in violation of the bankruptcy order.  Second, even if this court has the ability to equitably charge respondent Wilson with the fees and costs of this litigation, such allocation can and should be made at final distribution, at which time the court can assess to what extent respondent Wilson has been cooperative with the orders of this court as well as with any

28

notices terminating her tenancy."  (Italics added.)  Wilson fails to demonstrate error.

G.  Wilson's Request for Reimbursement

Wilson contends she is entitled to compensation from the other heirs for money she spent saving the Property from foreclosure.  She argues that, "in the event Danielle [] is able to force a sale of [the Property], [] Wilson must be reimbursed for those expenditures, with the remaining profit split between the heirs based on their respective interests in the property."

The Statement of Decision provides that "none of the intestate heirs are cotenants owners of the [Property]."  It further states that Wilson's entitlement to "reimbursement, contribution, and offset is denied without prejudice" because "such claims are property addressed at final distribution." The trial court observed that there may be a need for further briefing because "a monetary judgment in favor of [Wilson] . . . would appear to be under the purview of, as well as an asset of, the bankruptcy trustee."  Wilson fails to demonstrate error.

H.  Right to Buy Out Danielle Smith

Wilson contends she has the right to buy out Danielle, or any other heir, who wants to sell the Property under the Uniform Partition of Heirs Property Act (§ 7000 et seq.).  That issue, however, was not litigated at trial, and Wilson does not assert that the Statement of Decision contains any error in this regard.  We do not decide such issues in the first instance.

III.  DISPOSITION

The order is affirmed.

                                                    CHOU, J.


We concur.

JACKSON, P. J.
BURNS, J.


(A168896)