Filed 12/1/25; certified for publication 12/23/25 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| BRENDA LEE ALLEN, | |
| Plaintiff and Appellant, | E082051 |
| v. | (Super. Ct. No. CIVDS2011244) |
| ANIL BHULA PATEL et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of San Bernardino County. Michael A. Sachs, Judge. Affirmed.

The Blue Law Group and Michael K. Blue, for Plaintiff and Appellant.

Wood Smith Henning & Berman, Stephen M. Caine, R. Gregory Amundson, and Fred R. Vasquez, for Defendants and Respondents.

1

I.

INTRODUCTION

While plaintiff and appellant Brenda Lee Allen and her family were moving out of Ontario Airport Inn Hotel after an extended stay, she and the hotel owner, defendant and respondent Anil Bhula Patel, and the hotel manager, Luis Mejia, engaged in an altercation. Allen alleges that during the incident, Patel attacked and injured her. Allen brought a personal injury lawsuit against Patel and his company, DH Hotel Investments, Inc. (DH) (collectively referred to as defendant).[1] A jury awarded Allen over one million dollars in compensatory damages, and the court declared a mistrial at the bifurcated trial on her punitive damages claim, and thereafter granted defendant's motion for a new trial (MNT). Allen appeals.

Allen contends the trial court abused its discretion by granting the MNT based on attorney misconduct. She also argues the trial court abused its discretion by dismissing the jury at the bifurcated trial on her punitive damages claim. We affirm the trial court's order granting a new trial of phase one of the trial as to liability and compensatory damages. The issue of whether the court properly declared a mistrial of the punitive damages claim is therefore moot.

---

[1] Allen also named as a defendant, Ghomet Hospitality Group, Inc., which allegedly was operating the Hotel, along with DH. Ghomet Hospitality Group, Inc. was dismissed from the case and is not a party to this appeal. The court granted a directed verdict as to DH.

## II.

## FACTS

On March 14, 2020, Allen and her husband, son, and daughter checked in to the Ontario Airport Inn Hotel (Hotel) owned by Patel. Allen and her family stayed there for over 30 days and paid for their room through April 18, 2020. After moving out of their condominium because it had mold, the family intended to live at the Hotel temporarily until they found permanent housing.

Allen testified that on April 17, 2020, her family realized they did not have enough money to pay for any additional rent and therefore they needed to access their 401(k) funds. They needed a few days to access the funds. Therefore, the next day, April 18, 2020, Allen asked the hotel manager, Mejia, if she could have a few days to pay the additional rent. Mejia said no. Allen testified that Mejia became belligerent and told her to "'Get the F--- out!'" Because she was immunocompromised and it was during the COVID-19 pandemic, she feared she would not have a safe place to stay and would die. Mejia called the police three times in an attempt to evict Allen. The police told him that he could not force Allen to leave because she had been living there for over 30 days and therefore had tenant's rights. The police told Mejia not to engage in self-help.

The next day, April 19, 2020, Allen and her family were asked to leave the Hotel because of nonpayment. Allen told Mejia they needed more time. Mejia testified he allowed some delay. In the afternoon, he returned to Allen's room to check on her progress and help her move out. Patel accompanied Mejia.

Allen testified that Mejia went to her hotel room, pounded on the door, and threatened her with arrest of her and her family. Fearing arrest, Allen's husband rented a U-Haul truck to store their belongings. While he and the couple's son were loading the U-Haul in the Hotel parking lot, Mejia and Patel confronted Allen. Allen testified that Mejia slammed open the Hotel room door, which was slightly ajar. When Allen tried to shut the door, Mejia yelled at her to back away from the door. While Mejia held the door open, Patel entered the room without Allen's consent and threw the family's bags out into the hallway. Allen grabbed the bags back. Patel grabbed them away from her and slammed his fist into Allen. Allen testified that Patel then grabbed her and slammed her into the wall. Her head hit the wall, and she fell to the floor. Allen rushed to a telephone, called 911, and requested immediate police assistance.

Minutes later, Allen's husband and son returned. They noticed their belongings were in the hallway and heard Allen yelling, "'He hit me.'" "'He hit me.'" Allen looked frantic and terrified, and kept repeating, "'He hit me.'" "'He hit me.'" Allen pointed at Patel and said the police had been called and were on their way. The police arrived within minutes. Allen refused medical treatment by paramedics at the scene of the incident.

4

Police Officer Wilson testified that Allen told him Patel hit her one time with the back of his hand and pushed her against the wall. When Wilson interviewed Allen at the Hotel, her hands and arms were shaking, and she appeared distressed. The responding officers saw no evidence of a fight or any apparent injuries. Patel was placed under a citizen's arrest, requested by Allen, and was issued a misdemeanor battery citation to appear in court. Patel was taken to the police station for questioning and released after 30 minutes. Allen and her family continued living at the Hotel for an additional 10 days. They moved out after a police officer told Allen she needed to leave.

Allen testified she was never the same after the Hotel incident. She began having nightmares of Patel attacking her, got very little sleep, had nausea, and was nervous and fearful. Her treating psychologist, Dr. Carol Chambers, testified Allen developed permanent posttraumatic stress disorder (PTSD) from Patel and Mejia barging into her room, and Patel physically attacking her.

Allen testified that before the incident, she was fun, energetic, vivacious, loving, and a people-loving person. After the incident, she was timid and scared of everyone. Her relationships with her husband, children, and friends changed. She was constantly tired. Following the incident, she attended almost 100 visits with Dr. Chambers, over approximately two years, which helped with her PTSD.

5

## III.

## PROCEDURAL BACKGROUND

On June 5, 2020, Allen filed a complaint against defendant for damages, alleging Patel assaulted and injured her. The complaint included causes of actions for (1) battery, (2) assault, (3) false imprisonment, (4) intentional infliction of emotional distress, (5) invasion of privacy, (6) trespass, and (7) negligent hiring, supervision or retention of employee. The complaint sought compensatory and punitive damages. The trial court ordered bifurcation of the liability and compensatory damages phase of the trial from the punitive damages phase.

A. *Jury Trial*

The case proceeded to trial before a jury. During attorney Michael K. Blue's opening statement on behalf of Allen, he told the jury that it would hear from Allen's doctors and that there would be testimony that, after her altercation with Patel at the Hotel, she suffered from incontinence and PTSD, which she will suffer from for the rest of her life. Blue described in detail Allen's incontinence. Blue requested the jury to award Allen $6,000,000 in compensatory damages.

After Blue completed his opening statement, defendant moved for a mistrial on the grounds that Blue raised new and argumentative issues that were never disclosed before. Defendant argued that Blue improperly stated during his opening statement that Allen was immunocompromised and suffered from a bone disease. Defendant asserted that this was improper because Allen's attorneys would not be providing any medical testimony

6

by any designated medical physician, establishing these diagnoses or prognoses. The trial court responded that Allen's treating physician could testify regarding his own diagnoses but could not testify regarding other diagnoses or causation unless designated as an expert witness. There was no further ruling on the first mistrial motion.

After Allen completed presenting her case, the trial court sua sponte barred any argument to the jury regarding Allen's bowel problems or other gastrointestinal (GI) issues, because there was no evidence they were caused by the Hotel incident. During closing argument Blue did not mention that Allen suffered from GI problems, including incontinence. Following jury deliberations, the jury returned a verdict in favor of Allen and against Patel, in the amount of $1,051,200 in compensatory damages, as to the causes of action for battery and intentional infliction of emotional distress.

Two months after the completion of the liability and compensatory damages phase of the jury trial, the jury reconvened in February 2023 for trial of the punitive damages claim. Two jurors failed to appear. One had COVID and the other was unable to get to the courthouse because of a road closure near the juror's mountain home. The trial court declared a mistrial as to the punitive damages phase and discharged the jury because there were not enough remaining jurors to try the claim. During oral argument in this court, counsel agreed the trial court did not enter an order on the punitive damages claim, other than ordering a mistrial.

7

B. *Motion for New Trial*

In May 2023, Patel moved for a new trial under Code of Civil Procedure, section 657,[2] based on (1) irregularity in proceedings which prevented a fair trial, (2) accident or surprise, (3) excessive damages, and (4) insufficiency of evidence or the verdict is against law. (§ 657, subd. (1), (3), (5), & (6).) Allen filed opposition.

1. The Trial Court's Oral Statement of Reasons for Granting New Trial

After hearing oral argument on July 19, 2023, on Patel's MNT, the trial court ordered a new trial. During the hearing, the trial court stated in detail its reasons. The court found that Allen's evidence was tainted by Blue's misconduct. The court explained that it had granted several motions in limine (MIL) orders, which Blue violated. The trial court expressed concerns about Allen introducing evidence of bowel and G.I. issues, which Allen claimed were caused by the Hotel incident. The trial court asked Blue if there would be evidence offered by an expert showing causation linking Allen's GI claims with the Hotel incident, and Blue told the court, yes, which was false.

---

[2] Unless otherwise noted, all further statutory references are to the Code of Civil Procedure.

The trial court stated that from the inception of the trial, the most pervasive evidence offered to the jury was evidence of Allen's GI complaints, yet there was no trial evidence provided by any doctor on causation. Therefore, the jury was provided with "misinformation." The trial court, however, concluded that, despite its admonition to disregard the evidence, the jury could not set aside the graphic incontinence testimony.

The trial court found that "every witness for Plaintiff called by Plaintiff testified to those issues that there was no evidence of. At a minimum, Mr. Blue made a misrepresentation to the [c]ourt, knowing full well that those experts that you retained that you hired, did not have the qualifications, could not link her psychological issues to the bowel issues. [¶] And again, that was a representation you made to the [c]ourt. The [c]ourt allowed that testimony based on your representation. And that representation was essentially false." The court believed Blue presented inappropriate evidence to incite the jury's sympathy toward Allen, and this and other misconduct by Blue tainted the jury's findings. The court concluded that it believed that "the misconduct of counsel during the entire course of the trial, not just in closing argument, caused the jury to improperly inflate the value of the case based on passion or prejudice."

The court further stated that other misconduct included Blue violating MIL 1, which precluded testimony violating the "[g]olden [r]ule" and "reptile theory," which will be explained below. In addition, Blue violated California Rules of Professional Conduct rule 3.3 (a) (l) by misleading the judge and jury by knowingly making false statements of

fact or law, which included arguing Allen's bowel condition was related to the incident, when there was no evidence of it.

In addition, Blue improperly attacked the character and motives of defendant and his attorneys, and improperly suggested during closing argument that the jury should consider awarding punitive damages in the first phase of the trial. Blue also improperly mentioned that Patel would not serve any time in jail for assaulting Allen and therefore suggested that he be punished by the jury imposing monetary damages.

The trial court concluded that the above summarized misconduct by Blue persuaded the jury to award Allen excessive damages, and on that basis, the court granted defendant's MNT. The court added that it believed defendant did not get a fair trial because of the inappropriate comments and misrepresentations Blue made.

Blue argued during the MNT hearing that an expert was not required to establish causation, and Allen could establish it by testifying she experienced bowel issues for the first time after the incident. Blue further argued there was no evidence that he knowingly committed any misconduct. In addition, Blue argued that the evidence that Allen suffered PTSD was sufficient to support the verdict.

2. <u>Written Statement of Decision Granting New Trial</u>

On August 22, 2023, Judge Sachs entered a written detailed statement of the court's reasons for granting the motion.[3] The detailed written order reiterates the court's stated reasons during the MNT hearing.[4] The court stated in its written order that it found "there were significant irregularities in the trial consisting of counsel for Plaintiff, Mr. Michael K. Blue's misconduct, that were not curable by admonition, and it is reasonably probable that the party moving for a new trial could have obtained a more favorable result absent that misconduct."

The trial court explained that, first, Blue made statements of facts in his opening statement that he said would be proved, but then failed to do so, and thus misled the judge and jury by knowingly making false statements of fact or law. Blue said there would be expert evidence on the issue of causation, and then presented during the trial extensive gory, detailed evidence of Allen's GI complaints. There was no evidence that they were caused by the Hotel incident. The trial court was unconvinced that the jury could "set aside the graphic testimony regarding the Plaintiff's bowel conditions." The court found that "Blue's presentation of that evidence was an effort by counsel Mr. Blue to incite the jury, to cause them to be sympathetic, overly so, as to the Plaintiff in this

---

[3] A duplicate order granting the MNT was signed and filed on August 31, 2023.

[4] We note that some of the quotes incorporated in the trial court's written MNT order are not verbatim quotations. They are paraphrases of statements from the reporter's transcript.

11

case. The [c]ourt further finds that this was also a consistent hardcore theme of Plaintiff's counsel Mr. Blue in trying this case."

Second, the court found that Blue's closing argument improperly invited the jury to award punitive damages in the first phase of the trial, whereas Allen's punitive damages claim was bifurcated and to be determined in the second phase of the trial. Blue improperly encouraged the jury to punish Patel by awarding $6 million in damages, because Patel was not criminally prosecuted or incarcerated.

Third, the trial court stated in its written order that it reminded Blue throughout the trial that the community was not a party; yet Blue, nevertheless, urged the jury to "defend our community" against men who put their hands on vulnerable women, such as Allen.

Fourth, the court found that Blue violated the court's MIL order precluding golden rule and reptile theory arguments.

Fifth, the court found that Blue committed misconduct by repeatedly attacking the character and motives of defendant and its attorneys.

Sixth, the court found that Blue committed misconduct by repeatedly asking questions after the trial court had previously sustained objections and barred Blue from asking them.

In conclusion, the court stated it was granting a new trial based upon Blue making improper arguments to the jury, and that their effect on the jury could not be cured by admonition. The court concluded that defendant did not receive a fair trial because of the seriousness of Blue's misconduct and the likelihood the jury was prejudiced.

On August 18, 2023, Allen filed a form notice of appeal stating that she "appeals from the following judgment or order in this case, which was entered on *(date)*: 5/9/23, Order for new trial 7/19/2023." Allen also checked the box, next to "Other *(describe and specify code section that authorizes this appeal)*:" and stated, "Judgement[sic] from an Order Granting a New Trial Under Code of Civil Procedure, 904.1(a)(4)." We construe Allen's notice of appeal as appealing the order on July 19, 2023, granting defendant's motion for new trial.

IV.

STANDARD OF REVIEW

Allen argues that the de novo standard of review applies under *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 628, because the trial court failed to enter within 10 days a statement of reasons for granting the MNT, as required under section 657. Defendant argues the 10-day limitation period does not apply because Allen interfered with the court's ability to file a statement of decision by filing a peremptory challenge to Judge Sachs right after he heard and orally granted the MNT.

Section 657 states in relevant part that a verdict may be vacated and a new trial granted, on the application of the party aggrieved, for any of seven enumerated causes, materially affecting the substantial rights of such party. (§ 657.) Section 657 further states that, when a new trial is granted, "the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated." (§ 657.) In addition, the order granting the motion "must state the

13

ground or grounds relied upon by the court, and may contain the specification of reasons. If an order granting such motion does not contain such specification of reasons, the court must, within 10 days after filing such order, prepare, sign and file such specification of reasons in writing with the clerk." (§ 657.) The only relevant limitation on the trial court's discretion when deciding an MNT is that "the trial court must state its reasons for granting the new trial, and there must be substantial evidence in the record to support those reasons. [Citation.]" (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412.)

Here, the trial court's minute order on July 19, 2023, granting a new trial did not "state the ground or grounds relied upon by the court." (§ 657.) During the hearing on defendant's MNT on July 19, 2023, the trial court, however, orally stated in detail the court's reasons for granting a new trial. Although the trial court's July 19, 2023, minute order states that the MNT was granted based on the findings stated orally on the record, the reporter's transcript of those findings was not attached to the minute order. Also, there was no timely written statement of those findings filed, and when the written statement was eventually filed, the judge who filed the statement no longer had jurisdiction over the matter because of a peremptory challenge against him.

Regardless of whether or not these unusual circumstances trigger discretionary review by this court, we will assume this court must independently review the issue. As discussed below, under independent review, we conclude Blue committed misconduct, justifying a new trial.

14

V.

REASONS FOR GRANTING THE MNT

Allen contends the trial court erred in granting defendant's MNT based on irregularity in the proceedings, consisting of misconduct by Blue, and excessive damages (§ 657, subds. (1) & (5)). As we explain, we conclude Allen has not successfully rebutted the presumption of correctness of the new trial order or demonstrated that the trial court abused its discretion in granting a new trial.

An MNT may be made based on "[i]rregularity in the proceedings of the court, jury or adverse party . . . by which either party was prevented from having a fair trial." (§ 657, subd. (1).) "Attorney misconduct is an irregularity in the proceedings and a ground for a new trial. [Citation.]" (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148, citing *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870.) "But it is not enough for a party to show attorney misconduct. In order to justify a new trial, the party must demonstrate that the misconduct was prejudicial. [Citation.] As to this issue, a reviewing court makes 'an independent determination as to whether the error was prejudicial.' [Citation.] It 'must determine whether it is reasonably probable [that the appellant] would have achieved a more favorable result in the absence of that portion of [attorney conduct] now challenged.' [Citation.] It must examine 'the entire case, including the evidence adduced, the instructions delivered to the jury, and the entirety of [counsel's] argument,' in determining whether misconduct occurred and whether it was sufficiently egregious to cause prejudice." (*Garcia v. ConMed Corp.*, *supra*, at p. 149;

15

see also *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800, 802 (*Cassim*); *City of Los Angeles v. Decker*, *supra*, at p. 872.)

"Each case must ultimately rest upon a court's view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control, of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all the circumstances." (*Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 320-321; see also *Garcia v. ConMed Corp.*, *supra*, 204 Cal.App.4th at p. 149.)

Allen contends that the trial court erred in granting the MNT based on Blue committing misconduct during (1) the hearing on defendant's MILs, (2) Blue's opening statement, (3) the trial, and (4) Blue's closing argument. We disagree.

A. *MILs*

The trial court stated during the MNT hearing and in its written statement of decision that Blue made knowingly false and misleading statements to the court during the hearing on defendant's MILs, which led the trial court to reasonably believe that Blue would introduce expert testimony establishing causation between the Hotel incident and Allen's incontinence. Because of being misled in this regard, the trial court did not exclude the prolific, graphic, inflammatory testimony describing Allen's incontinence and its impact on her daily activities. Allen argues that Blue never promised the trial court that he would provide expert testimony establishing causation. And even if he did, the trial court did not reasonably rely on it, because the court knew Allen had only one

16

designated expert, Dr. Chambers, who testified she did not have the expertise to testify regarding Allen's GI problems or causation.

Although the record shows that Blue did not make an *express* promise to introduce expert witness testimony or other evidence establishing causation, there is substantial evidence supporting a reasonable finding that Blue knowingly misled the trial court into believing that Blue would introduce expert testimony establishing causation. As a result, the court permitted extensive prejudicial, inflammatory incontinence evidence.

Defendant filed several MILs, including numbers 7, 11, 13, and 19, which sought to exclude prejudicial, inadmissible evidence, and inflammatory evidence relating to Allen's physical and mental health. When ruling on these MILs, the court made it clear that it was improper to introduce evidence of Allen's GI issues, such as her bowel problems and incontinence, unless Allen provided expert opinion that they were caused by the Hotel incident.

In MIL 7, defendant requested the exclusion of opinion testimony by Allen and her lay witnesses regarding the cause of her medical conditions. The stated grounds for MIL 7 were that such lay testimony was irrelevant and, also, that opinions on medical causation are within the knowledge of experts, not lay persons, and were highly prejudicial to defendant. The trial court granted MIL 7.

Defendant requested in MIL 11 exclusion of expert testimony beyond the subject matter set forth in expert disclosure and depositions. The trial court granted MIL 11. The court clarified that Allen's treating psychiatrist, Dr. Guthrie, could testify as a percipient

17

witness to his psychiatric examination and diagnosis of Allen, but not as to causation because Dr. Guthrie was not a designated expert witness.

In MIL 13, defendant requested the exclusion of evidence of lay witness self-diagnosis of injuries and lay opinion regarding the cause of injuries. The trial court granted MIL 13.

Defendant requested in MIL 19 the exclusion of testimony by Allen regarding self-diagnosis and treatment for a GI condition, superior mesenteric artery syndrome (SMA). Allen argued that the Hotel incident caused her to suffer from acute stress disorder, which became PTSD, which in turn caused her to lose a substantial amount of weight, and led to SMA. Dr. Chambers, who was Allen's sole designated expert witness, acknowledged during her deposition that she did not review Allen's pre-incident medical records, which showed that Allen's weight loss preceded the incident. Dr. Chambers also testified that her expertise as a psychologist did not include expertise as to SMA or its diagnosis. She stated during her deposition that she was not an expert on SMA, its causes, or its symptoms. Defendant therefore argued that Allen could not connect her stress disorder or PTSD to her SMA diagnosis. The court initially granted MIL 19, but then decided to defer ruling on it until hearing the context within which such testimony was requested.

These MILs, summarized above, relate to the admissibility of evidence regarding Allen's alleged physical and mental health conditions, including GI issues. During the hearing on these MILs, there does not appear to be any statements by Blue expressly promising the court that he would provide expert testimony establishing causation

18

between Allen's incontinence and the Hotel incident.  The transcript of the MIL hearing, however, demonstrates that the court made it clear to Blue that any nonexpert evidence regarding Allen's diagnoses or medical conditions, such as incontinence, was inadmissible in the absence of expert medical testimony establishing causation.

The trial court stated during the MIL hearing that lay witnesses, including Allen, could not testify to a diagnosis.  Only a medical doctor designated as an expert witness could provide such testimony.  The court warned Blue that, "if you don't have a doctor who is going to be able to provide a diagnosis, you are not going to get any of your diagnoses into evidence, any of them."  While there does not appear to be any evidence that Blue expressly promised during the MIL hearing to provide expert testimony establishing that Allen suffered from incontinence caused by the Hotel incident, we conclude Blue did make statements during the MIL hearing and trial in which he knowingly led the trial court to believe such expert testimony of causation would be provided.

B. *Opening Statement*

Evidence that Blue misled the court and jury includes his statements made during his opening statement, in which he told the jury that there would be evidence showing that Allen suffered from incontinence after the incident, and it was caused by Patel's acts committed during the Hotel incident.  Blue told the jury that it would hear testimony that she experienced constant panic, shaking, and incontinence for at least two years after the incident, "all sourced by Mr. Patel. . . .  There is panic.  [¶]  She has now incontinence.

19

She manures on herself constantly. She can't go to places because she needs to be near a bathroom." Blue added that, when attacked, Allen was "a 56-year[-]old woman [with] bone disease."

A little later during the opening statement, Blue again stated that Allen suffers from incontinence. "So she feels humiliated. She manures on herself. She manures on herself. She has to go to the bathroom constantly. You will hear it. You will hear her family. At one point she had to put towels from the bed to the bathroom because she would manure the whole way. It's humiliating. She goes out. She manures on herself. It stinks. You'll hear. You will hear her children. She goes to a store. She has to rush to the bathroom. She will be in a stall, and it will stink so badly she will wait until everyone is gone. That's who Brenda Allen is today. That wasn't who she was on April 18, 2020." Blue told the jury she also lost a lot of weight because of the incident. She was 133 pounds at the time of the incident and afterwards dropped to 86 pounds. Later during the opening statement, Blue again mentioned Allen's incontinence. "The incontinence we talked about – she wears Depends now, in her fifties now. She is wearing Depends. And it still leaks all over her. Still leaks." Blue added that she has nightmares and constant nervousness and panic attacks.

C. *Trial Testimony*

Blue was informed and well aware that introducing evidence of Allen's GI issues, including incontinence, was improper and prohibited unless there was expert testimony by a designated expert witness doctor who diagnosed the condition and testified it was

20

caused by the Hotel incident. Nevertheless, Blue introduced extremely graphic, inflammatory evidence of Allen's incontinence, knowing full well that he was unable to provide expert witness testimony demonstrating that the Hotel incident caused Allen's incontinence.

Blue elicited inflammatory testimony from several lay witnesses who described Allen's incontinence. Allen's son, Franke Torres, who was 20 or 21 years old, testified that he observed Allen "spilling poo on herself" and saw "poop on the floor, poop on the mattress." He noticed the smell wasn't "similar to her regular poop." He recalled "wiping her down" and Allen "pooping herself" in public. Allen's daughter, Sofia, who was then 14 years old, testified that she saw Allen "poo on herself" every few days. Sofia and her brother and other family members helped clean the "poo" on Allen, who was "embarrassed" by being helped "clean it."

During the trial, Blue asked Allen's friend of nearly 20 years, Deborah Moffitt, if she noticed Allen having any "bodily function kind of stuff." Moffitt testified that when she went with Allen to the court and waited a few minutes in the car while Allen dropped something off, Allen would return after having "lost control of her bowels." Moffit described it as "disgusting. . . . [N]ow she lived with the humiliation of losing control of her bowels. . . . And the smell was putrid. And she was so embarrassed. And we had to drive home with the windows open. And I just felt so sorry for her." Blue asked Moffitt to describe what Allen looked like, and Moffitt responded in gross detail that "she had feces coming down her leg . . . ."

21

Blue elicited testimony from Allen as well, in which she testified that her son and daughter helped clean her up. She wore "adult diapers" because she would "poo" on herself every day, "multiple times," and the diapers sometimes leaked, and it would run down her legs and in the back. It smelled "rotten," "bad," and it "lingers." Allen said she felt embarrassed and guilty about her children looking at her and helping her clean-up. She also felt humiliated wearing adult diapers, and feared people would "see me poo" and "smell it." Blue asked Allen if she had been diagnosed with SMA. She said she had and did not have it before the incident. Allen said SMA was very painful and was the cause of her weight loss. Allen testified that the pain in her "mid-section" was caused by Patel hitting her and it "affected eating." Allen further testified that she had been taking various medications before the incident, including Xanax "for years" for stress, Ambien for sleeping, Percocet for pain in her spine, and medication for hypertension.

Allen stated that, beginning in May 2020, after the incident, she saw psychiatrist Dr. Guthrie for therapy 86 times, once a week. She admitted she did not tell him she had smoked a couple of packs a day since her late 20s. She also drank 12 Coca Colas a day. In 2021, a year after the Hotel incident, Allen was hospitalized for two weeks. Doctors told her she was having a stomach problem attributed to SMA, which was causing her to lose weight.

Drs. Chambers, Guthrie, and Wertheimer testified during the trial, but none of them provided any expert testimony that after the Hotel incident, Allen was diagnosed with incontinence, or that Allen's incontinence was caused by the Hotel incident. Dr. Chambers was Allen's treating psychologist after the incident and Allen's sole designated expert. Dr. Guthrie was Allen's treating psychiatrist and was not a designated expert witness. Psychologist Dr. Wertheimer was defendant's sole designated expert. None of the doctors were qualified to give expert testimony regarding Allen's GI problems or provide testimony regarding causation.

Dr. Wertheimer testified he reviewed Allen's deposition testimony and records relating to her psychological status. He stated that Allen had lost a significant amount of weight, both before and after the incident. She also had reported gastrointestinal symptoms such as "vomiting" months before the incident. In response to questioning by Allen's attorney, Mr. Aloupas, Dr. Wertheimer stated that the medical records did not state why Allen was losing weight, but there was documentation that she had SMA, which is gastrointestinal and "has a lot to do with the G.I. system, the gastrointestinal system, where an obstruction can occur." Dr. Wertheimer said it was unclear whether Allen's loss of appetite and weight was caused by the Hotel incident, because the condition occurred both before and afterwards. It was also unclear from Allen's records when her SMA developed. Dr. Wertheimer further testified that he was unqualified to diagnose or testify about SMA, and therefore did not give an opinion as to whether SMA or Allen's bowel problems were proximately caused by the incident.

23

Dr. Wertheimer noted that "what's really remarkable is the consistency of symptoms at pre-incident and post-incident meaning nausea, sleep deprivation, anxiety and the panic attacks. All that was pre -- was relevant post during that weight loss period." Dr. Wertheimer acknowledged that having anxiety is not necessarily a panic attack, but some people use the term "panicking" as an "anxiety attack" or "panic attack." He said the triage notes were unclear because they merely stated that Allen had significant anxiety and was treated with Xanax. Dr. Wertheimer stated he was not giving a diagnosis on whether Allen had PTSD, and was unable to provide an opinion as to the validity of Dr. Chambers's diagnosis that Allen was currently suffering from PTSD, because Dr. Wertheimer had not met or examined Allen.

Dr. Chambers, who was a psychologist and not a medical doctor, testified that she evaluated Allen in December 2022 and diagnosed her as having PTSD. Dr. Chambers testified that at the time of her deposition, she was unaware Allen "had been documented as having anxiety" or that she was taking Xanax. Dr. Chambers was also unaware Allen had complained of sleep issues before the incident or that she was taking Ambien for them before the incident. She stated she was unaware Allen was taking Zoloft, which can have side effects of difficulty sleeping, decreased sexual desire, severe appetite disturbance, and nausea. Dr. Chambers did not testify as to causation of Allen's bowel problems. Dr. Chambers acknowledged that nausea and vomiting are not psychological symptoms and that GI problems were beyond her expertise.

On the trial court's own motion at the end of Allen's case, the court stated that it would not allow any argument to the jury regarding Allen's bowel problems or other GI issues, because there was no evidence they were caused by the Hotel incident. The trial court also admonished the jury not to consider such testimony when deciding the case. The trial court stated during the MNT hearing that it was unconvinced when hearing Patel's MNT that the jury could "set aside the graphic testimony regarding the Plaintiff's bowel conditions." The court therefore concluded that Blue's misconduct supported granting a new trial. The court found that "Blue's presentation of that evidence was an effort by counsel Mr. Blue to incite the jury, to cause them to be sympathetic, overly so, as to the Plaintiff in this case. The [c]ourt further finds that this was also a consistent hard core theme of Plaintiff's counsel Mr. Blue in trying this case."

We conclude there was substantial evidence in the record supporting the trial court's findings that Blue made knowingly false and misleading statements and elicited inadmissible, prejudicial, and highly inflammatory testimony in violation of the court's orders and warnings not to introduce evidence of Allen's incontinence unless Blue was able to introduce expert witness testimony establishing a medical diagnosis of her condition and that it was caused by the Hotel incident. The court made it clear that, otherwise, such evidence could not come in. Disregarding the trial court's directives and MIL orders, Blue introduced extensive inflammatory, prejudicial evidence of Allen's incontinence, without presenting any evidence that it was caused by the Hotel incident.

We further conclude that such misconduct was prejudicial because it is reasonably probable defendant would have achieved a more favorable result in the absence of the prolific, graphic, inflammatory incontinence evidence. (*Garcia v. ConMed Corp.*, *supra*, 204 Cal.App.4th at p. 149; see also *Cassim*, *supra*, 33 Cal.4th at pp. 800, 802; *City of Los Angeles v. Decker*, *supra*, 18 Cal.3d at p. 872.) It is unlikely that the jury would have awarded Allen over a million dollars in compensatory damages based solely on finding Allen suffered from PTSD caused by the Hotel incident.

While there is evidence that Patel may have pushed Allen, which Patel denies, there is no evidence she suffered any physical injuries, other than possibly a bruise on her chest, which was not in the location where Allen said Patel struck her. Also, Allen declined treatment by paramedics at the scene, and did not seek any treatment for several days after the incident. There is also evidence that before the incident, Allen had pre-existing physical ailments and mental health issues that were similar, if not the same or related to the issues she claimed arose from PTSD suffered after the incident.

D. *Closing Argument*

The trial court's additional grounds for granting defendant's MNT, which are based on Blue committing misconduct during closing argument, are also well founded. The record shows several instances in which, during closing argument, Blue made improper arguments in violation of the golden rule and reptile theory, and inappropriately impugned opposing counsel.

26

### 1. Golden Rule Violation

Before the trial, the trial court heard defendant's MIL 1, in which defendant requested that the trial court exclude evidence and arguments based on the golden rule and reptile theory,  The trial court initially deferred ruling on MIL 1, as to the golden rule, until it became an issue during the trial.  Later in the trial, the trial court granted defendant's objection to Blue's closing argument on the ground it violated the golden rule.

During closing argument, when asking the jury to compensate Allen for her injuries, Blue requested the jury to imagine the following scenario:  "There is a big limousine that drives up into the parking lot, and it parks right next to the U-Haul.  And out of that limousine comes a person really well dressed, perfect suit, perfect socks, perfect shoes.  Six other people and they all have black briefcases, shiny black briefcases.  They walk down the corridor to Room 163, and they knock on the door and get past Mr. Mejia and Mr. Patel.  And they all walk in and open the door. . . .  [¶]  First guy, the main guy comes, and he has this big shiny briefcase.  And he sees Ms. Allen, and he opens [h]is briefcase.  There is a crisp $100 bill, all of the briefcases, $6,000,000.  And he shows it. . . .  He says Ms. Allen, this is for you.  You can have every one of these.  You can do whatever you want with these.  It's yours.  Take it for the rest of your life."  Defendant objected at this point, stating "[g]olden rule."  The trial court overruled the objection.

Blue continued: "So the man closes the briefcase and puts it down and says to Ms. Allen 'You can have that, but I'm going to want something. I'm going to take every single thing that matters to you. I'm going to take your husband and all that love that you have enjoyed. I'm going to take your dignity. I'm going to take your calm. I'm going to take everything that matters to you. You will never have that again ever. And I'm going to leave this briefcase outside the door because you don't have a choice. [¶] Now, in the beginning of this case I had mentioned compensation is an equal fair value." Defendant again objected, stating "[g]olden rule." The trial court sustained the objection and instructed the jury not to consider the discussion regarding "the briefcase and the money inside."

The trial court concluded during the MNT hearing and in its statement of decision, that Blue violated the court's order not to violate the golden rule, when Blue made the above analogy. In effect, Blue asked the jury if it would accept $6,000,000 in exchange for being put in Allen's position. A "golden rule" argument is one where "counsel asks the jurors to place themselves in the plaintiff's shoes and to award such damages as they would 'charge' to undergo equivalent pain and suffering." (*Beagle v. Vasold* (1966) 65 Cal.2d 166, 182, fn. 11; see *Cassim, supra*, 33 Cal.4th at p. 797.)

Making a golden rule argument is improper because "[t]he jury must impartially determine pain and suffering damages based upon evidence specific to the plaintiff, as opposed to statistical data concerning the public at large. The only person whose pain and suffering is relevant in calculating a general damage award is the plaintiff. How

28

others would feel if placed in the plaintiff's position is irrelevant.[] It is improper, for example, for an attorney to ask jurors how much 'they would "charge" to undergo equivalent pain and suffering.' [Citation.]" (*Loth v. Truck-A-Way Corp.* (1998) 60 Cal.App.4th 757, 764-765, fn. omitted.) A golden rule argument, "'in effect asks each juror to become a personal partisan advocate for the injured party, rather than an unbiased and unprejudiced weigher of the evidence. Finally, it may tend to induce each juror to consider a higher figure than he otherwise might to avoid being considered self-abasing.'" (*Id*. at p. 765, quoting *Neumann v. Bishop* (1976) 59 Cal.App.3d 451, 484-485.)

Here, Blue violated the golden rule during closing argument by suggesting that when considering the amount of fair value compensation Allen should receive for her losses, the jurors should imagine what it would be like to be forced to accept the loss of "every single thing that matters" to them in exchange for a briefcase full of money.

### 2. Reptile Theory

Blue also committed misconduct by violating the reptile theory doctrine during closing argument. The court made it clear during the hearing on MIL 1 that reptile theory arguments were improper. Reptile theory arguments attempt to appeal to a jury's emotions by arguing a defendant's conduct threatens the community's safety. (*Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 599.) A violation of the reptile theory occurs when counsel asks jurors to base their decisions on concerns about their own safety and the safety of the community rather than the applicable standard of care. (*Id*. at pp. 598-

29

599 [closing argument remarks telling jury its function was to keep the community safe were improper]; *Cassim*, *supra*, 33 Cal.4th at p. 796 [arguments appealing to the self-interests of jurors are improper because they tend to undermine juror impartiality.].)

Blue began his opening statement by stating, "I'm scared. I couldn't sleep last night because I'm scared. It's an enormous obligation to represent somebody who cannot represent themselves. . . . I'm shaking. My knees are shaking. . . . It's a privilege of a lifetime . . . when you believe in somebody. My fear is that I have not done a good enough job to represent that person the way that person deserved to be represented that I have failed. And at some point I'm going to hand this case . . . to you for you to take this case for me. And that scares me to death."

Blue then told the jury it had "an opportunity to make a difference. We go through life, try to set an example, try and do the right thing. Maybe somebody will see. Maybe our children will see. Maybe our students will see. But seldom do we have an opportunity to defend our community, to champion our community, to stand as the last bastion for what we will tolerate for our community. Will we tolerate men coming into a room with a vulnerable woman, the most vulnerable of us and put their hands on her? Will we tolerate that? That decision is going to be your decision in just a few moments."

Blue noted that "we are stuck with a money justice system. . . . Mr. Patel will not serve a day in jail aside from any potential charges that may be filed against him in criminal court, but that's not for us. [¶] Here in this civil justice system, Mr. Patel will not serve a day in jail. Judge Sachs will not call the deputies to have him escorted. The

deputies won't take Mr. Patel out to the public square and have him flogged.  Mr. Patel will not be escorted to the front of the courthouse to wear a sign that says 'Shame on me.'  None of that is going to happen.  It's just money, dirty money."  Blue added that "all we have to ask for is money."

Blue further told the jury:  "We have the power to decide what is right.  We have the power to decide what is just.  We have the power to claim to the world that in this community a person cannot put their hands on another person.  We have that power, and we can proclaim it. . . .  [¶]  So ultimately the power is yours.  And that power extends into the future to protect the innocent of your community.  It's up to you.  Do you want to protect the most vulnerable, the innocent?  Do you want to protect the members of your community from someone just putting their hands on you?"  Blue added that Allen's attempt to stay at the Hotel without paying rent "doesn't give a person a right to put their hands on her. . . .  It's up to you.  It's up to you to exercise that power.  It's up to you.  And the opportunities are so few, so few to go and apply that power to make a change to make a real change to protect your community.  And in so doing I believe that in so doing I believe fulfill your destiny.  It's why we are here.  These opportunities are so few.  We ought not to waste them.  Fate chooses a precious few."

Blue also told the jury that the court reporter was recording everything "because it's a historical record.  It's a record to show what happened here on this day in this courtroom in this community.  Your grandchildren's grandchildren will be able to come

here and see what happened on this day.  You can see the defenders of a community tell a person you cannot put his hands on a member of the community . . . ."

We conclude the trial court reasonably found during the MNT hearing and in its statement of decision that Blue violated the reptile theory by telling the jury it had "the power to claim to the world that in this community a person cannot put hands on another person."  Blue's closing arguments improperly urged the jury to enter a verdict against defendant as a way of protecting the community from harm, in violation of the reptile theory.

### 3. Attack on Character and Motives of Defendant and His Attorney

The trial court granted the MNT in part based on the finding that Blue repeatedly attacked the character and motives of defendant and its attorneys.  For instance, near the end of closing rebuttal, Blue told the jury:  "Now look, Mr. Amundson [defense counsel] is going to make one of three calls and have one of three conversations with Mr. Patel.  If you come back with a zero verdict, he is going to say 'Good news.  Keep doing what you're doing.  Keep violating the rules.'  If you come back with less than full and fair compensation, he's going to say 'A little adjustment but you can still violate rules, ignore the police, attack women, attack vulnerable people.  Or if you come back with full and fair compensation, he is going to say 'You better change your ways now.'  That's what we are asking you."  This argument impugned the integrity and motives of defense counsel, and it did not provide any relevant, factually based argument.  It merely suggested that

Amundson was an unethical, unscrupulous, callous lawyer. This was inflammatory and potentially undermined the jury's impartiality.

"In conducting closing argument, attorneys for both sides have wide latitude to discuss the case." (*Cassim*, *supra*, 33 Cal.4th at pp. 795-796; see also *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 795.) However, "[a]n attorney who exceeds this wide latitude commits misconduct. . . . '[H]e may not assume facts not in evidence or invite the jury to speculate as to unsupported inferences.' [Citation.] Nor may counsel properly make personally insulting or derogatory remarks directed at opposing counsel or impugn counsel's motives or character." (*Cassim*, *supra*, at p. 796.)

Here, Blue improperly speculated as to what defense counsel might say to his client, in the absence of any evidence supporting such speculation. Such unfounded remarks directed at opposing counsel were personally insulting or derogatory and therefore constituted additional misconduct. (*Cassim*, *supra*, 33 Cal.4th at pp. 795-796.)

We therefore conclude, based on the record as a whole, that the trial court's order granting a new trial must be sustained on appeal, because substantial evidence in the record supports the trial court's findings of misconduct, and Allen has not sufficiently demonstrated that no reasonable finder of fact could have found for defendant based on the trial court's detailed statement of reasons during the MNT hearing and in the written statement of decision. (*Lane v. Hughes Aircraft Co.*, *supra*, 22 Cal.4th at p. 412.) Moreover, the evidence was in conflict, and a defense verdict could have been reached. Therefore, the presumption on appeal is in favor of the new trial order, and Allen has

33

failed to rebut that presumption. (*Ibid*.) Furthermore, the trial court reasonably found that defendant did not receive a fair trial because of Blue's prejudicial misconduct. Therefore, the trial court's order granting defendant's MNT was not an abuse of discretion.

## VI.

## DISPOSITION

The trial court's order granting a new trial of phase one of the bifurcated trial as to liability and compensatory damages is affirmed. The issue of whether the court properly declared a mistrial of the punitive damages claim is therefore moot. Defendant is awarded its costs on appeal.

CODRINGTON
Acting P. J.

We concur:

FIELDS
J.

MENETREZ
J.

34

CERTIFIED FOR PUBLICATION

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

## **ORDER**

| | |
|---|---|
| BRENDA LEE ALLEN, | E082051 |
|    Plaintiff and Appellant, | |
|    v. | (Super. Ct. No. CIVDS2011244) |
| ANIL BHULA PATEL et al., | |
|    Defendants and Respondents. | ORDER CERTIFYING |
| |        OPINION FOR PUBLICATION |

_____

THE COURT

Requests having been made to this court pursuant to California Rules of Court, rule 8.1120(a), for publication of a nonpublished opinion heretofore filed in the above matter on December 01, 2025, and it appearing that the opinion meets the standards for publication as specified in California Rules of Court, rule 8.1105(c),

IT IS ORDERED that said opinion be certified for publication pursuant to California Rules of Court, rule 8.1105(b).  The opinion filed in this matter on December 01, 2025, is certified for publication.

CERTIFIED FOR PUBLICATION

CODRINGTON
Acting P. J.

Panel: Codrington
     Fields
     Menetrez

cc:    See attached list

MAILING LIST FOR CASE: E082051
Brenda Allen v. Anil Patel et al.


Superior Court Clerk
San Bernardino County
8303 N. Haven Ave
Rancho Cucamonga, CA 91730


Michael K. Blue
Michael Sarkisyan
The Blue Law Group Inc.
10737 Laurel Street, Suite 210
Rancho Cucamonga, CA 91730-7800


Stephen M. Caine
R. Gregory Amundson
Wood, Smith, Henning & Berman LLP
6A Liberty Street, Suite 200
Aliso Viejo, CA 92656


Fred R. Vasquez
Wood Smith Henning & Berman LLP
Via Piemonte, Suite 205
Apt 223
Ontario, CA 91764